609 A.2d 297

**Eileen Marie BRADY, et al.**

v.

**RALPH M. PARSONS COMPANY.**

**No. 96, Sept. Term, 1990.**

Court of Appeals of Maryland.

July 21, 1992.

William J. Blondell, Jr., argued and on brief (Edward T. Pinder and William J. Blondell, Jr., Chartered, on brief), Baltimore, for petitioners.

Edward C. Mackie, argued and on brief (Paul J. Weber, Rollins, Smalkin, Richards & Mackie, on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned, and BRUCE C. WILLIAMS, Chief Judge of the Fifth Judicial Circuit of Maryland, Specially Assigned.

McAULIFFE, Judge.

At common law an employee could sue his employer for negligence in failing to use reasonable care to provide a safe workplace. The employer-defendant could assert the defenses of contributory negligence and assumption of risk. In 1914 Maryland passed its first workers' compensation law, providing compensation to employees and their dependents for accidental injuries which arose out of and in the course of employment. This compensation scheme involves

certain trade-offs: employees and their dependents receive benefits according to a schedule which does not, however, include damages for pain and suffering, loss of enjoyment of life, or the like; on the other hand, the employer is required to provide benefits regardless of fault,[1] and the defenses of contributory negligence and assumption of risk may not be asserted to defeat a compensation claim. With the exception of certain narrow grounds not here relevant, workers' compensation is the exclusive remedy of the injured employee and his dependents against an employer for an injury or death covered by the compensation law.

The question presented by this case is whether a defendant who is not an employer of the worker involved, and thus does not have the protection of the "exclusive remedy" provisions of the workers' compensation law, may assert the defenses of contributory negligence and assumption of risk when an action in negligence is brought by the dependents of the deceased workman who allege failure to provide a safe workplace and who claim the defendant violated safety regulations intended for the benefit of the deceased worker.

Donald C. Brady (decedent) was working on the construction of the Cold Spring Lane Station of the Baltimore Regional Rapid Transit System when, on 18 June 1981, he suffered a fall that caused his death. Brady worked for Rocky Mountain Skylight, Inc. (Rocky Mountain), a subcontractor of Hensel–Phelps Construction Company (Hensel–Phelps), the general contractor on the project. The owner of the property was the Mass Transit Administration (MTA), an instrumentality of the Maryland Department of Transportation and the owner of the Baltimore subway. In addition to hiring Hensel–Phelps as the general contractor,

---

**1.** An employee may, however, be denied benefits if the employer shows by substantial evidence that the injury was caused by certain deliberate acts or willful misconduct of the employee, or was caused solely by intoxication or by the illegal use of certain drugs. *See* Maryland Code (1991 Repl.Vol.) § 9–506 of the Labor and Employment Article.

MTA also contracted with the respondent herein, Ralph Parsons Co. (Parsons), to serve as construction manager, and with Baltimore Regional Insurance Transit Services (BRITS), a joint venture of insurance agencies, to design and administer a coordinated insurance program and safety program for the project.

As a part of its contract, Parsons undertook to "provide the necessary consultant, coordinating, management, technical, supervisory and inspection services required by the MTA for construction of the project." As construction manager, Parsons' duties were extensive, and included the following responsibilities pertaining to safety:

> The CM shall provide safety engineering services, coordinated with BRITS, necessary to develop and ensure the application of a uniform system of safety and accident prevention and reporting procedures. The CM shall also provide safety engineering services as required to ensure compliance with the provisions of the MTA Construction Safety Manual; the contractual obligations of MTA contractors, other applicable guidance. The CM shall also direct contractors to correct any unsafe acts or conditions that may be detected.

The MTA Construction Safety Manual required that Parsons provide a qualified, full-time, on-site supervisory staff for the management and inspection of all construction work being performed on the project and required the staff, among other things, to recommend construction techniques to expedite the project and assure job safety. Parsons also prepared a manual for Construction Management Services which detailed a number of safety responsibilities.

Parsons was required to provide a chief safety engineer, whose duties included implementing the safety program, inspecting work in progress, reporting hazards or unsafe practices, and conducting regular safety meetings with the contractor's foreman and with representatives of the various crafts. The safety engineer was also directed to assure compliance with federal and state safety requirements and applicable codes and to ensure the contractors' compliance

with the provisions of the MTA Construction Safety Manual.

Brady's survivors and the Personal Representative of his estate (plaintiffs) sued Parsons for negligent performance of its safety responsibilities. The trial court entered summary judgment against the plaintiffs on the ground that MTA was a statutory employer of Brady within the meaning of the workers' compensation law and therefore entitled to the immunity from tort action provided by that law, and that Parsons, having assumed some of MTA's duties, was entitled to the same "immunity." This Court reversed, holding that MTA was not a statutory employer of Brady and that Parsons was not entitled to immunity under the workers' compensation law. *Brady v. Ralph Parsons Co.*, 308 Md. 486, 508–13, 520 A.2d 717 (1987).

The action was then tried, and a jury returned a special verdict finding that Parsons was negligent, but also finding that Brady was contributorily negligent and had assumed the risk. The trial judge entered a judgment in favor of the defendant, and the plaintiffs appealed. The Court of Special Appeals affirmed. *Brady v. Parsons Co.*, 82 Md.App. 519, 572 A.2d 1115 (1990). The intermediate appellate court agreed with plaintiffs that Parsons owed an "assumed duty" to Brady to supervise, implement, and enforce safety programs on the project, including the duty to enforce safety measures at the worksite in compliance with federal and state occupational safety and health regulations. That Court further held, however, that the affirmative defenses of contributory negligence and assumption of risk were properly submitted to the jury.

The plaintiffs filed a petition for certiorari with this Court, arguing that the affirmative defenses should not have been available to the defendant because Parsons owed a nondelegable duty to Brady and because Parsons violated a safety regulation, and because the evidence was insufficient to support either defense. Parsons did not file a cross-petition. We granted plaintiffs' petition.

We will decide this case on the issues presented to us by the parties—specifically, whether the defenses of contributory negligence and assumption of risk were available to Parsons under the facts of this case. We note in passing, however, that there are significant questions concerning the existence and extent of a tort duty owed by Parsons to Brady which are not before us and which we do not address. Parsons was not an employer of Brady— neither in the traditional sense nor as a "statutory employer" under the workers' compensation law of this state. With respect to any tort duty that Parsons may have owed to Brady as a result of duties Parsons assumed by virtue of its contract with MTA, this Court pointed out in *Council of Co-owners v. Whiting–Turner*, 308 Md. 18, 32, 517 A.2d 336 (1986), and in *Matyas v. Suburban Trust Co.*, 257 Md. 339, 344, 263 A.2d 16 (1970), that when parties contract with one another to undertake a duty which neither of them is under a legal obligation to perform, they may have a responsibility to each other for a breach of that agreement, but a previously non-existent tort duty to third persons will not thereby be created. Although MTA could by contract share its tort duties with Parsons, their contract would not ordinarily create new tort duties in favor of third parties,[2] and the duties assumed by Parsons would not ordinarily exceed those owed by MTA to Brady.

In *Rowley v. City of Baltimore*, 305 Md. 456, 505 A.2d 494 (1986), we discussed at some length the duties of a landowner who had employed an independent contractor to perform certain work on the premises. We there noted the various provisions of Chapter 15 of the Restatement (Second) of Torts, dealing with the liability of an employer of an

---

2. Under some circumstances, when a person undertakes to render services to another which he should recognize as necessary for the protection of a third person, that person may have a duty to use reasonable care to protect his undertaking. This is generally true in cases where the actor's failure to exercise reasonable care increases the risk of harm or where the harm is suffered because of reliance of the other or the third person on the undertaking. *See Restatement (Second) of Torts* § 324A (1965).

independent contractor, and we reproduced comments by Dean Prosser suggesting the absence of intent by the drafters of the Restatement to expressly include employers of independent contractors within the protection of that chapter. *Id.* at 466–75, 505 A.2d 494. We specifically pointed out the anomaly of providing greater protection to employees of an independent contractor than to the defendant's own employees and the effect of workers' compensation laws, and held that those provisions of the Restatement were generally intended for the protection of persons other than the independent contractors and their employees. *Id.* at 470–71, 505 A.2d 494.

In analyzing the extent of any tort duty that MTA may have owed to employees of subcontractors, we note that MTA did retain some degree of control over the project by the terms of its contracts with Parsons, Hensel–Phelps, and BRITS. Section 414 of the Restatement (Second) of Torts provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Putting aside for the moment the question, discussed above, whether employees of subcontractors are within the class of persons to whom the duty referred to in this section may run, we note from the Comments to this section that the principle is intended to apply where there is retention of control over the operative detail of the work. Comment c states:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe

alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

*See generally Krieger v. J.E. Greiner Co.*, 282 Md. 50, 382 A.2d 1069 (1978); *Parker v. Neighborhood Theatres*, 76 Md.App. 590, 598–602, 547 A.2d 1080 (1988); *Lunde v. Winnebago Industries, Inc.*, 299 N.W.2d 473, 479–80 (Iowa 1981). As noted above, the parties have proceeded on the assumption that the degree of control retained by MTA, and by contract shared with Parsons, was sufficient to give rise to a duty flowing from Parsons to the employees of subcontractors, and we shall indulge the same assumption for purposes of this case. The jury having found that Parsons was negligent in the performance of its duties,[3] we turn to a consideration of whether the defenses of contributory negligence and assumption of risk are available to Parsons and if so, whether there was sufficient evidence to support the jury's findings on those issues.

Initially, plaintiffs contend that Parsons' duty was "nondelegable," and for that reason Parsons cannot advance defenses of contributory negligence and assumption of risk. Plaintiffs argue that allowing these defenses would be tantamount to placing some responsibility on Brady for his own safety, and thus "delegating" some of Parsons' nondelegable duty. Plaintiffs misconstrue the meaning of the term "nondelegable duty." As ordinarily

---

**3.** Plaintiffs suggest that the breach of duty found by the jury may have involved the failure of Parsons to conduct sufficient inspections, or to detect, report, and require correction of the chronic use by Rocky Mountain employees of scaffolds without guardrails or other fall protection. There was evidence from which the jury could have found that employees of Rocky Mountain had used incompletely assembled scaffolds to attach cladding to other beams during the 11 months preceding this accident, and that no complaint was lodged concerning this practice.

used in this context the term means a duty that cannot be avoided by the employment of an independent contractor.

There are ... situations wherein the law views a person's duty as so important and so peremptory that it will be treated as nondelegable. Defendants who are under such a duty "... cannot, by employing a contractor, get rid of their own duty to other people, whatever that duty may be." Duties imposed by statute are often found to be of this kind....

5 Harper, James, and Gray, *The Law of Torts* § 26.11 at 83 (2d ed. 1986) (footnotes omitted). *See also Council of Co-owners v. Whiting–Turner, supra,* 308 Md. at 39–41, 517 A.2d 336; *Rowley v. City of Baltimore, supra,* 305 Md. at 466, 505 A.2d 494. We explained in *Rowley* that the term "nondelegable" is "something of a misnomer, as the owner is free to delegate the duty of performance to another, but he cannot thereby avoid or delegate the risk of non-performance of the duty." *Id.* Contrary to the plaintiffs' contention, the defenses of contributory negligence and assumption of risk are ordinarily available in an action based upon a breach of a nondelegable duty.

Next, plaintiffs contend that Parsons violated safety statutes or standards promulgated for the benefit of workers, and as a result Parsons should be held to strict liability without benefit of the defenses of contributory negligence or assumption of risk. The sources to which plaintiffs refer are the Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. §§ 651 through 678, the Maryland Occupational Safety and Health Act (MOSH Act), §§ 5–101 through 5–901 of the Labor and Employment Article, Maryland Code (1991 Repl.Vol.), and the standards adopted pursuant to those statutes.[4]

---

4. The OSH Act gave the states the option of pre-empting the operation of the federal act by securing approval of the Secretary of Labor of a comparable or more stringent state act. 29 U.S.C. § 667. *See Gade v. National Solid Wastes Mgt. Assn.,* —— U.S. ——, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). On 18 July 1985, Maryland received final approval of the MOSH Act. *See* 50 Fed.Reg. 29210–01. Maryland has adopted

Plaintiffs contend there was evidence of failure to comply with several safety standards, including the following sections of 29 C.F.R.:

§ 1926.451(e)(10) requiring guardrails at all open sides and ends of scaffolds more than ten feet above the ground or floor.

§ 1926.451(e)(3) requiring proper bracing of scaffolds.

§ 1926.105(a) requiring that "[s]afety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical."

Plaintiffs do not contend that inadequate bracing of the scaffold caused or contributed to Brady's fall.[5] A citation was issued pursuant to the MOSH Act, charging Rocky Mountain with serious violations for alleged failure to comply with §§ 1926.451(e)(10) and 1926.451(e)(3). Rocky Mountain was not charged with a violation of § 1926.105(a).

The task that Brady was performing at the time he fell should have taken no more than ten or fifteen minutes. It involved attaching a prefabricated sheet of aluminum cladding to a horizontal beam that rested upon vertical columns and supported a skylight over the station platform. Brady, as the working leader of a three-man team, directed the construction of a scaffold from which he and another worker were to install the cladding. As erected, the scaffold was ten feet high, on eight inch wheels, for an overall deck height of 10'8" above the rail bed. At this point, the railway was elevated. The rails and station platform were on the base of a "U"-shaped run, which was supported by vertical columns joined at the top by horizontal beams. The

---

the federal standards upon which plaintiffs rely in this case. See COMAR 09.12.31.

5. The MOSH safety inspector reported that cross-bracing which should have been secured to the scaffold bucks by pins was tied with wire at the bottom level, apparently because of the existence of a curb that prevented insertion of the pins at that level.

vertical walls of the "U"-shaped run were approximately five feet high and were inside of and contiguous to the vertical supporting columns. The west end of the scaffold was placed 17 inches from the west vertical wall of the run.

Brady and his men erected the scaffold almost directly beneath, and parallel to, the horizontal beam to which they were to attach the cladding. The scaffold, which was approximately ten feet long, was placed parallel to the horizontal beam, and perpendicular to the tracks. A guardrail was attached on the south side of the scaffold along its full length, but no guardrails were erected on the north side or on the east or west ends. The explanation given by one of the workers for this omission was that if remaining guardrails had been attached, the top rails would have been higher than the horizontal beam above the scaffold, and no part of the scaffold could have been placed beneath the horizontal beam. This, the workman explained, would have made the installation of the final piece of cladding more difficult, if not impossible, because a portion of the cladding had to be attached to the underside of the beam.

The particular piece of cladding involved was one-eighth inch aluminum, approximately 7 feet long by 24 inches wide. The aluminum had been bent to an "L" shape along its length, with the legs of the "L" being approximately 18 inches and 6 inches respectively. When put into place along the horizontal beam, the 18–inch leg would cover a vertical face of the beam and the 6–inch leg would complete the coverage of the underside of the beam. There were apparently clips on the underside of the beam into which the cladding had to be fit, as well as tabs on both faces of the beam to which the cladding would be rivetted. Silicone caulking was to be applied at the edges to ensure a watertight installation. All of the other cladding on the vertical and horizontal beams at this station had been installed earlier. This particular piece was missing because the material originally supplied had been improperly fabricated and did not fit.

The witnesses did not agree on the circumstances of Brady's fall. Edward Kennel, one of Brady's co-workers, said that he saw Brady climb onto the scaffold and install the top rail of the scaffold along its south side. He said Brady then began scraping old silicone caulking (applied when the earlier installation was attempted) from the horizontal beam. Kennel, who was on the station platform near the base of the scaffold, was gathering tools and did not see Brady fall. He said he looked up only to see Brady's hands disappearing outside the west wall of the run.

Anthony Hicks testified that he saw Brady fall. Hicks said he was standing outside his place of business just across Wabash Avenue from the Cold Spring Lane Station, a distance of about 300 to 350 feet from where Brady was working. He said Brady first got onto the scaffold, but then climbed onto the wall beside the scaffold. Hicks said that another workman placed what looked like a piece of air-conditioning duct on the wall; that as Brady lifted the metal piece it came toward him and appeared to hit him in the face; that Brady was unable to get or maintain a hold on the nearby scaffold; and that Brady fell backwards off the wall headfirst toward the ground.

■ Whichever version the jury accepted, the evidence was sufficient to support the findings of assumption of risk and contributory negligence. Clearly, the jury could have found that Brady should not have climbed onto the wall, and was negligent in doing so. Although a fall from that wall to the east (track side) would have involved a distance of only about five feet, a fall to the west meant a drop of approximately 40 feet to the ground below. The risk was immediately apparent, and the evidence was sufficient to support a finding that Brady knew of the existence of the risk and appreciated its unreasonable character.

■ If the jury found that Brady fell from the scaffold, a closer question is presented, but the result is the same. The risk of a fall from a scaffold unprotected on three sides was apparent. Although the principal risk appeared to

involve a fall of a little more than ten feet to the track surface within the run, the risk of a fall from the unprotected west end of the scaffold and the possibility of falling outside the run onto the ground below was also apparent. The jury could readily have found from the evidence that Brady had the requisite knowledge and appreciation of these risks.

Plaintiffs argue that any assumption of the risk by Brady was not, however, voluntary. They contend that a worker's exposure to a risk is not voluntary if that worker's choice was between encountering the risk or quitting his job. Plaintiffs' argument is deficient in several respects. First, assuming that economic compulsion resulting from a well-grounded fear of loss of employment will render an assumption of risk involuntary,[6] there is no evidence in this case that anyone compelled Brady to work from an unfinished scaffold without adequate fall protection, or threatened him with loss of employment if he did not perform the task in that manner. *See Burke v. Williams,* 244 Md. 154, 158, 223 A.2d 187 (1966) (no evidence that deliveryman used slippery plank walkway against his will). We are not here faced with a situation where a supervisor ordered an employee to perform a task in a certain way or face loss of employment. Brady was the leader of his crew; it was he who directed the assembly and placement of the scaffold, and it was he who went upon it when he did. There is no evidence that Brady could not have insisted upon the erection of a safe scaffold or other fall protection before completing this task, or that his employer would have criticized Brady for his insistence upon safe procedures.

Indeed, there was evidence from which the jury could have concluded that Brady could have erected a safe scaf-

---

**6.** See, however, *Prosser and Keeton on the Law of Torts* § 68 at 491 (5th ed. 1984), noting that "in the absence of a statute the greater number of courts for a long time held that a risk was assumed even when a workman acted under a direct command carrying an express or implied threat of discharge for disobedience."

fold and completed the task with the material at hand, but that he proceeded in the manner he did because his method was somewhat faster and "easier," even though more dangerous. The guardrails which should protect the perimeter of the top level of the scaffold, and which extend approximately 42 inches above the decking and provide a safe workplace, could have been installed in minutes, except for the location of the scaffold. As Kennel pointed out, Brady had constructed the scaffold so that a portion of it was beneath the horizontal beam in order to facilitate the attachment of the bottom flange of the cladding to the underside of the beam. In this position, the guardrails that should have been installed along the north, east, and west sides of the scaffold could not be put in place because of insufficient clearance beneath the beam. The defendant argued, however, that the scaffold could have been moved back until it was just south of the beam, so that all the guardrails could have been installed and yet the workers could have had access to the beam. Although Kennel testified that this would have made installation of the cladding more difficult, if not impossible, the jury had the benefit of a full set of photographs of the worksite and surrounding area and a complete description of the installation process, from which the jury could have concluded that this would have been a feasible and safe alternative.

Additionally, as a question from the jury during the course of Kennel's testimony indicated, the jurors may have concluded that the scaffold could have been moved slightly to the north, so that the horizontal beam was between the north and south edges of the scaffold. This would have allowed ready access to both faces of the beam and permitted the insertion of the north and south guardrails. From the photographs, the jurors could have concluded that the narrower east and west ends of the scaffold could then have been protected by rope or cables being tied between the north and south rails at the east and west ends, just beneath the horizontal beam, or by the installation of two-by-fours bolted into position at that point, thereby providing

adequate fall protection on all sides. For all of these reasons, we conclude the evidence was sufficient to permit the jury to find that in opting for the faster, easier, and more dangerous approach, Brady had voluntarily assumed the risk.

■ Plaintiffs' contention is that even if the evidence was sufficient to permit a finding of assumption of risk or contributory negligence, those defenses should not have been submitted to the jury because Parsons' negligence was predicated upon the violation of a safety regulation intended for the protection of workers. Plaintiffs rely upon §§ 483 and 496F of the *Restatement (Second) of Torts* (1965). Section 483, dealing with contributory negligence, provides:

> The plaintiff's contributory negligence bars his recovery for the negligence of the defendant consisting of the violation of a statute, unless the effect of the statute is to place the entire responsibility for such harm as has occurred upon the defendant.

Section 496F, dealing with assumption of risk, is to the same effect:

> The plaintiff's assumption of risk bars his recovery for the defendant's violation of a statute, unless such a result would defeat a policy of the statute to place the entire responsibility for such harm as has occurred upon the defendant.

As plaintiffs correctly point out, the word "statute" in each section is intended to include ordinances and administrative regulations. *See* Comment a to § 483 and Comment b to § 496F.

■ We conclude that the principle announced by these sections of the Restatement is not applicable in this case. Comments b and c to § 483, which are equally applicable to § 496F, explain that not every statute, ordinance, or regulation aimed at promoting safety is intended to have the effect contemplated by these sections.

b.   Where the defendant's negligence consists of the violation of a statute, an ordinance, or an administrative regulation, and the action for negligence is based upon such a violation, the contributory negligence of the plaintiff ordinarily bars his recovery, as in the case of any other negligence of the defendant.   Thus where, in violation of a number of different statutory provisions, the defendant is driving his automobile at an excessive speed, the plaintiff's contributory negligence in failing to exercise, for his own protection, care to avoid a collision will bar his recovery....

c.   There are, however, exceptional statutes which are intended to place the entire responsibility for the harm which has occurred upon the defendant.   A statute may be found to have that purpose particularly where it is enacted in order to protect a certain class of persons against their own inability to protect themselves.   Thus a statute which prohibits the sale of firearms to minors may be clearly intended, among other purposes, to protect them against their own inexperience, lack of judgment, and tendency toward negligence, and to make the seller solely responsible for any harm to them resulting from the sale.   In such a case the purpose of the statute would be defeated if the contributory negligence of the minor were permitted to bar his recovery.

*　　*　　*　　*　　*　　*

Neither the OSH Act nor the MOSH Act was intended to relieve workers of a duty to exercise reasonable care for their own safety.  To the contrary, both Acts recognize that the objective of preventing accidents in the workplace may be accomplished only by the combined efforts of employers and employees.  *See Brennan v. Occupational Safety & Health Rev. Com'n,* 511 F.2d 1139, 1144 (9th Cir.1975) (OSH Act intended to promote increased safety of working conditions through the cooperative efforts of employers and employees).  In the Congressional statement of findings and declaration of purpose and policy preceding the OSH Act, Congress declared its purpose to promote safe and

healthful working conditions and to preserve human re-
sources—

(1) by encouraging employers and employees in their
efforts to reduce the number of occupational safety and
health hazards at their places of employment, and to
stimulate employers and employees to institute new and
to perfect existing programs for providing safe and
healthful working conditions; [and]

(2) by providing that employers and employees have sepa-
rate but dependent responsibilities and rights with re-
spect to achieving safe and healthful working conditions.

*     *     *     *     *     *

29 U.S.C. § 651. Similarly, the Maryland OSH provides
that:

The purposes of this title are to ensure, to the extent
practicable, that each working man and woman in the
State has working conditions that are safe and healthful
and to preserve human resources by:

(1) providing that employers and employees have sepa-
rate but dependent responsibilities and rights with re-
spect to making working conditions safe and healthful;

*     *     *     *     *     *

Section 5–102(b) of the Labor and Employment Article.

Moreover, as the OSH Act makes clear, its purpose is to
promote safety through a system of standards that may be
enforced against employers through civil fines and criminal
penalties, and not to change the existing common law
relationship between employers and employees.

Nothing in this chapter shall be construed to supersede
or in any manner affect any workmen's compensation law
or to enlarge or diminish or affect in any other manner
the common law or statutory rights, duties, or liabilities
of employers and employees under any law with respect
to injuries, diseases, or death of employees arising out of,
or in the course of, employment.

29 U.S.C. § 653(b)(4).

■ The OSH Act does not impose strict liability upon
an employer, even in connection with the civil penalties and

criminal sanctions that are provided in the Act. *Pennsylvania P. & L. v. Occupational S. & H.R. Com'n,* 737 F.2d 350, 354 (3d Cir.1984) (OSH Act does not impose strict liability on employers for isolated and idiosyncratic instances of employer misconduct); *Whirlpool Corp. v. O.S. & H. Review Com'n,* 645 F.2d 1096, 1098 (D.C.Cir.1981); *Central of Ga. R. Co. v. Occup. S. & H. R. Com'n,* 576 F.2d 620, 623 (5th Cir.1978); *Brennan v. Occupational Safety & Health Rev. Com'n, supra,* 511 F.2d at 1143–45; *Brennan v. Occupational Safety & Health Review Com'n,* 502 F.2d 946, 951–52 (3d Cir.1974).

Some courts have held that a showing of a violation of an OSH Act standard establishes negligence *per se* (although not all courts so holding agree on what is meant by negligence *per se* ). *See, e.g., Pratico v. Portland Terminal Co.,* 783 F.2d 255, 266–68 (1st Cir.1985); *Kelley v. Howard S. Wright Const. Co.,* 90 Wash.2d 323, 582 P.2d 500, 508 (1978). There is also authority supporting plaintiffs' view that proof of a violation of an OSH Act or similar standard precludes the defenses of contributory negligence and assumption of risk. *See, e.g., Wren v. Sullivan Elec., Inc.,* 797 F.2d 323, 326–27 (6th Cir.1986); *Bowman v. Redding & Co.,* 449 F.2d 956, 965–67 (D.C.Cir.1971); *Martin v. George Hyman Const. Co.,* 395 A.2d 63, 71 (D.C.App.1978).

█ We are of the view, however, that although evidence of a violation of an OSH or MOSH Act standard may be admissible in an appropriate case to assist the trier of fact in determining whether an employer or one having the duty of an employer was negligent, proof of a violation of such a standard does not establish negligence *per se,* nor does it in a case such as this preclude consideration of the defenses of contributory negligence or assumption of risk. In *Lawrence v. Cavanaugh,* 249 Md. 176, 238 A.2d 859 (1968), this Court held that the defense of assumption of risk is available to an employer sued by an injured employ-

ee, notwithstanding the existence of a statute[7] requiring employers to furnish a safe place to work and to

> install, maintain and use such methods, processes, devices and safeguards, as are reasonably necessary to protect the life and safety of such employees, and ... do every other thing reasonably necessary to render safe such employment and place of employment.

We divine no intent on the part of the legislature to change that established rule of law by the adoption of the MOSH Act. For other cases holding that a violation of an OSH Act or similar standard does not abrogate the common law defenses of contributory negligence or assumption of risk, see *Ries v. National Railroad Passenger Corp.*, 960 F.2d 1156 (3d Cir.1992); *Albrecht v. Baltimore & Ohio R. Co.*, 808 F.2d 329, 332–33 (4th Cir.1987); *Minichello v. U.S. Industries, Inc.*, 756 F.2d 26, 29–30 (6th Cir.1985); *Carroll v. Getty Oil Co.*, 498 F.Supp. 409, 416–17 (D.Del.1980); *Bertholf v. Burlington Northern Railroad*, 402 F.Supp. 171, 172–73 (E.D.Wash.1975); *Krall v. Royal Inns of America, Inc.*, 374 F.Supp. 146, 150 (D.Alaska 1973); *Bachner v. Rich*, 554 P.2d 430, 438–39 (Alaska 1976); *Hebel v. Conrail, Inc.*, 475 N.E.2d 652, 656–58 (Ind.1985).

Having found that the defenses of contributory negligence and assumption of risk were available in this action, we need not consider Parsons' additional argument that the impact of the OSH and MOSH Acts should not apply to it because those Acts are directed against employers, and Parsons was neither an employer nor one who agreed to share the duties of an employer, but was at most one who shared the lesser duties of an owner of the premises. *See Minichello v. U.S. Industries, Inc., supra*, 756 F.2d at 29–30.

For the reasons stated, we agree with the Court of Special Appeals that the defenses of contributory negligence and assumption of risk were properly submitted to

---

7. Maryland Code (1957) Article 89, § 29, later repealed upon adoption of the MOSH Act.

the jury in this case, and that the trial judge therefore correctly entered judgment in favor of the defendant.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.