633 A.2d 485

**E.G. ROCK, INC., et al.,**

v.

**Laura DANLY.**

**No. 203, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 3, 1993.

412

George L. Huber, Jr., argued (Christopher M. Erwin and Huber & Lutche, on the brief), Baltimore, for appellant, E.G. Rock.

Dean P. Gunby, argued (Jo Anna Schmidt and the Law Offices of Harold A. MacLaughlin, on the brief), Baltimore, for appellant, Baltimore Historic Properties, etc.

Kenneth L. Thompson, argued (Kaye L. Pestaina and Piper & Marbury, on the brief), Baltimore, for appellee.

Argued before GARRITY, ALPERT and CATHELL, JJ.

ALPERT, Judge.

Laura Danly ("Appellee") was a tenant in the premises located at 115 West Monument Street, Baltimore City, Maryland ("premises"). On December 12, 1987, she was assaulted by an unidentified man. Action was brought in the Circuit Court for Baltimore City against Baltimore Historic Properties Limited Partnership ("BHP") and E.G. Rock, Inc. ("Rock"), among others,[1] alleging negligence on part of BHP and Rock. From a jury verdict for appellee, (David Ross, J., presiding), BHP and Rock appeal and ask us the following:

   I.    Did the trial court commit reversible error in its instructions to the jury on the legal duty owed by the Defendants to the Plaintiff?

   II.  Did the trial court commit reversible error with respect to E.G. Rock's claim for indemnity against Baltimore Historic Properties?[2]

---

**1.** At all times relevant to the present case, BHP was a Maryland limited partnership formed in October 1986. BHP's general partners are Susquehanna Development Corporation, Inc., a Maryland corporation, James E. Clare, and Norman E. Rockwell.

**2.** This issue is raised by Appellant Rock.

We hold that, on both issues, the trial court did not commit reversible error, and, therefore, affirm the judgment.

### Facts

Laura Danly wanted to live in the Mount Vernon section of Baltimore City. Around the first week of November 1987, she was walking in the Mount Vernon area when she realized she was passing E.G. Rock's office. Having previously noticed that Rock managed a lot of properties, she decided to walk in and get some information. She was introduced to Bill Fink [3] ("Fink") who subsequently took her to see the premises at issue; she immediately fell in love with it. About a week later, she returned to Rock's office and, by appointment, met with Fink and Ms. Ethel S. Braun (a.k.a. Ethel Carter) ("Carter"), Rock's owner. Appellee, along with Fink, revisited the premises the same day. Even though the building was substantially complete, she had some reservations about entering into a lease. She wanted to make sure that the apartment would be "finished and ready to be moved in" and "that there would be no more workmen in [her] apartment after [she] moved in." Appellee consented, upon verbal assurances by Fink, to an oral agreement and deposited earnest money for the apartment by a check payable to Rock.

On November 24, 1987, appellee returned to Rock's office and did an "on-site inspection" of the premises. Since "substantial work had been done, and a lot of the apartment had been finished", she made out a check payable to E.G. Rock for "the first month's rent and the security deposit minus the $100.00 earnest money" and signed the lease. This is where, for the first time, she met John McCarthy [4] ("McCarthy") and discussed with him and Fink the security system for the

---

3. Bill Fink was a sales representative with Rock.

4. John M. McCarthy was employed by BHP and Susquehanna Development Corporation ("Susquehanna") and was responsible for the day-to-day operations of construction and leasing of properties owned by Susquehanna.

building. She moved into the apartment on or about the first Monday in December 1987.

Appellee was aware of the fact that the building was not totally finished when she moved in. She observed, however, that

I took the top floor apartment. That was the third floor, and the third floor and second floor apartments were all completed and ready to be moved in and, in fact, there was another tenant who had already moved into the second floor. The first floor there was painting going on, and things like that, but all the walls were up and it looked fairly complete, and I know they were working on the basement, working on, trying to look at the laundry room and stuff like that. But from all of the residence floors, which were the third and the second floors, that was all completed.

There were, however, other problems with her apartment which she listed and reported to Fink because, she stated, "He told me to. He told me if there were any problems with the apartment to talk to him, and when I did call to complain, he responded to my complaint, and he also acted on them. I mean, I got some things done." For his part, Fink stated that once he received a complaint, he would forward it to McCarthy or Bill Warren [5] since Rock had no authority to solve the problem. In fact, Carter noted that her home phone number was given to all tenants with respect to property either leased or managed by Rock as an emergency number. There seems to be considerable debate as to the relationship between the appellants, as evidenced by the cross appeal from the lower court's judgment (i.e., Issue II). BHP maintains that there was no management contract between the two parties and that Rock is liable for its own *independent* acts of negligence. In support, BHP refers to the testimony of the two principals (i.e. Carter for Rock and James Clare for BHP) wherein both parties testified that there was no management agreement between Rock and BHP. BHP also asserts that allowing

---

**5.** Bill Warren apparently was the owner of the construction company that was the general contractor for this project.

Rock to amend its complaint after all the evidence had been presented would be prejudicial. They claim that had BHP known about Rock's indemnity claim, it would have modified its approach to the whole case. BHP, therefore, argues that the jury instructions given were appropriate as Rock had not pleaded the existence of a contract which would have required the judge to give instructions on the indemnity issue.

Rock maintains that there was a management contract between it and BHP. Specifically, Rock asserts that McCarthy acknowledged the existence of a contract when he stated that the contract for 809 Cathedral Street was extended to 115 West Monument Street. Rock, therefore, argues that since the 809 Cathedral Street management contract contained an indemnity clause, the same indemnity clause is applicable to the "contract" for 115 West Monument Street. Rock also contends that the trial court should have given instructions as to the law of principal and agent.

In any event, appellee started noticing that workmen had gained access to her apartment without her permission. Specifically, she testified that

On one of the first few days that I was there, I came home at night and saw where there had been a, a ceiling panel taken out of the ceiling, and they had obviously done something up there. I don't know. It wasn't one of the things I needed, and there was a pile of mess on the floor where they had taken it out and hadn't cleaned it up, and so I was upset as I knew that someone had come in and I hadn't been notified.

Additionally, the day before the assault, appellee was awakened by "two men standing on the fire escape looking in [her] bedroom window." She immediately called Mr. Fink and reported that "having people on the fire escape looking into [her] bedroom window was very upsetting to [her], and was there to be any work having to do with my apartment or access or around my apartment, that [she] needed to be notified." All of this brings us to the events at issue.

On December 12, 1987, appellee was sleeping in her apartment when she was awakened by the sound of someone entering through the front door. She was quite startled and proceeded to jump out of her bed and go out into the foyer. There, she discovered a young man (who still remains unidentified) dressed in work clothes. She questioned him as to why he was in her apartment, and he explained that he was on the premises to do clean up work. Appellee, who had never seen the intruder before, told him "this is my apartment. I live here. This is not for you to be cleaning up, you know, I'll clean up myself." The intruder apologized and left the apartment, whereupon she immediately called Rock in order to lodge a complaint with Fink. The phone was answered by Carter, whom appellee informed that

> [she] was very upset and [Carter] said, well, is there something I can help you with. So, I told her what had happened, and I told her, because I didn't know whether she knew about the day before, you know, the incident with the fire escape and so forth, and I, I was very upset. And I told her, I was very explicit—I said I wanted two things from her. One was that she find out if this guy is who he says he is and secondly, that this was the last time I was going through this and if it happened again, I would consider the lease terminated and I would move out. .

Carter was sympathetic towards appellee's concern and "volunteered that we would see what it was all about."

About the same time, McCarthy arrived at Rock's offices and was apprised of what had transpired. Together with Carter, he returned to the premises. Upon arriving at the apartment building, they realized that neither of them had keys to the building. They noticed an individual in the building with a broom in his hand, who subsequently let them in. Carter and McCarthy introduced themselves and McCarthy asked this individual who he was and what he was doing there. The individual stated that he was working for the contractor and that he was cleaning up. Both, Carter and McCarthy, failed to ask this individual for identification demonstrating his employment by the construction company.

Thereafter, Carter, McCarthy and this individual went up to see appellee. There, according to the testimony of appellee and Carter, McCarthy introduced the individual (whom the appellee recognized as being the earlier intruder) as being a construction worker. McCarthy chastised the intruder for entering appellee's apartment, and both he and Carter apologized to appellee. McCarthy also stated that he would verify who the intruder was and further warned the intruder that he better be the person he was claiming to be. Carter, while not actively participating in the oral dialogue, agreed with McCarthy's statements. Appellee was satisfied by the representations put forth by Carter and McCarthy because, she testified,

> They didn't say to me, you know, we'll have to check into this and get back to you or we'll get back to you later today or anything that indicated that there was anything further to be done. They, they [sic] simply said just the opposite, in fact. They were so sorry, and if anything like this ever happens again, you know, please call us.

Appellee specifically testified that, had she been advised that the intruder's identity was not verified, she would have called the police and would not have returned to her apartment that night.

McCarthy went on to make at least two, and maybe three, calls to B.W. Construction the same day; however, he was not successful in verifying the employment status of the intruder. McCarthy also testified that Carter had also called the construction company to determine the identity of the intruder. Neither McCarthy nor Carter informed appellee of their inability to determine the intruder's identity.

Later that same day, appellee returned to the premises after running some errands. She then encountered the intruder walking out of her apartment with what appeared to be two suitcases full of her belongings. When asked by appellee to relinquish the suitcases, he refused and stated that he would kill her if she tried to stop him. Appellee descended the stairs and tried to escape but was grabbed by the intruder and dragged into the sub-basement. The intruder tied appel-

lee to the bannister at the bottom of the stairs and then left. As a result, appellee suffered serious physical and mental injuries.

An action was brought in the Circuit Court for Baltimore City by appellee against BHP and Rock. The jury awarded damages against BHP and Rock on a finding of negligence of both. Rock asserts that the trial court erred in its instructions to the jury on the legal duty owed to appellee by Rock and BHP and that the court failed to instruct the jury properly on the applicable law of principal and agent. Further error is assigned by Rock to the court's failure to instruct the jury on Rock's claim for indemnity against BHP and Susquehanna. BHP, for its part, adopts Rock's position on the first issue. It does, however, on the second issue, maintain that the trial court was correct in not giving instructions on Rock's indemnity argument. From the circuit court's judgment, appellants filed a timely appeal, and thereby ask us to address the two questions put forth above.

### Discussion

We must consider two issues. First, we must determine whether the trial court was correct in refusing to give the requested instructions on the negligence issue. Second, we must ascertain whether the trial court should have given jury instructions regarding the indemnity issue.

Since "[a] litigant is entitled to have his theory of the case presented to the jury," a trial court is required to give the requested jury instructions (1) if it correctly states the law, and (2) if the law is applicable. *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979) (*quoting Levine v. Rendler*, 272 Md. 1, 320 A.2d 258 (1974)). Additionally, Md. Rule 2–520(c) provides:

How Given—The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Md.Rule 2–520(c) (1993 & Supp. Aug. 1993). Therefore, in reviewing the propriety of a trial court's decision, we must "determine whether the requested instruction was a correct exposition of the law, whether that law *was applicable* in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *Wegad v. Howard Street Jewelers,* 326 Md. 409, 414, 605 A.2d 123 (1992) (emphasis added).

## A.  *The Negligence Issue*

Negligence can be established by demonstrating the following four elements:

(1) a duty owed to the plaintiff by the defendant;  (2) a breach of that duty by the defendant;  (3) a legally cognizable causal relationship between the breach of duty and the harm suffered;  and (4) damages suffered by the plaintiff.

*Yousef v. Trustbank Savings, F.S.B.,* 81 Md.App. 527, 535–36, 568 A.2d 1134 (1990) (citations omitted); *see also Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756 (1986).

■  Appellants argue that the court erred in refusing to grant their requested jury instructions.[6]  They state that by

---

**6.**  Appellant Rock requested the following instructions:

**No 25:**
A landlord has a duty to exercise reasonable care for the safety of his tenants.  If a landlord knows or by the exercise of reasonable care should know criminal activity against persons or property has occurred on his property, he has a duty to take reasonable measures to protect his tenants against these criminal activities.
In determining whether the measures taken by the landlord were sufficient, his acts can be measured only by the criminal activities occurring on his property and of which he knows or should have known and not by those criminal activities occurring generally in the surrounding neighborhood.
Appellant BHP requested the following:
**No 15:**
A landlord or property owner is not an insurer of a tenant's safety.
A landlord has a duty to exercise reasonable care for the safety of his tenants.  If a landlord knows or by the exercise of reasonable care should know criminal activity against persons or property has oc-

instructing the jury to determine whether appellants had "exercised reasonable care" the court "failed to enunciate the concurrent standard for a landlord that the acts be 'measured' by 'the criminal activities occurring on his property' and 'of which he knew or should have known.'" Accordingly, the instructions were not in accordance with *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976).

Appellee asserts that the trial judge gave the correct instructions. Her case is predicated on appellants' voluntarily undertaking a duty to provide for her safety on the premises. In support of this argument she states

This duty was assumed by E.G. Rock when its agent, Ethel Carter, responded to Ms. Danly's complaint of a strange man in her apartment and by telling Ms. Danly that she would look into the matter. Indeed, Ms. Carter went further when she came to Ms. Danly's apartment and engaged in conduct that created the impression with Ms. Danly that Appellant E.G. Rock had verified the identity of the intruder.

A similar argument is made regarding BHP's assumption of a duty through its agent McCarthy. The issue, therefore, as phrased by appellee, is "having assumed this duty it was up to the jury to decide whether appellants exercised reasonable care."

Appellee states that the trial court did not commit reversible error since it gave the proper instructions. She points out that the instructions requested by appellants are premised on the occurrence of prior criminal activity on the premises. She contends that the *Scott* case and ultimately the instructions requested by appellants were not an issue in the case below. Alternatively, appellee maintains that even if *Scott* were applicable, appellant's instructions did not correctly reflect the landlord's duty to its tenant. We agree.

---

curred on his property, he has a duty to take reasonable measures to protect his tenants against these criminal activities.

The court issued the following instructions regarding the duties that apply to appellants:

Now, we have spoken of negligence. Negligence is doing something that a person using ordinary care would not do or not doing something a person using ordinary care would do. Ordinary care is that caution, attention or skill a reasonable person would use under similar circumstances.

A person who volunteers or agrees to do something to protect another even though there was no pre-existing duty to protect, must exercise reasonable care in doing what was volunteered or agreed to be done.

Reasonable people change their conduct according to the circumstances, and the danger they know or should know exists. Thus as danger increases, a reasonable person acts more carefully.

Appellee's case is predicated on the Good Samaritan doctrine as defined in the Restatement (Second) of Torts § 324A (1965). In pertinent part, the doctrine states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Court of Appeals of Maryland has not, unlike other courts,[7] specifically endorsed this section. It has, however, been recognized as a part of Maryland law. *See In re Sabin*

---

7. *See, e.g., United States Fidelity & Guaranty Co. v. Jones*, 356 So.2d 596, 597–98 (Ala.1978); *Huggins v. Aetna Cas. & Sur. Co.*, 245 Ga. 248, 264 S.E.2d 191, 192 (1980); *Pippin v. Chicago Housing Auth.*, 78 Ill.2d 204, 35 Ill.Dec. 530, 533–534, 399 N.E.2d 596, 599–600 (1979); *Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 570–71 (Minn.1979); *American Mutual Liability Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 48 Wis.2d 305, 179 N.W.2d 864, 868 (1970).

*Oral Polio Vaccine Products Liab. Litig.*, 774 F.Supp. 952, 954–55 (D.Md.1991) ("It is undisputed that the [Good Samaritan] doctrine is a part of the tort law both of Maryland") *aff'd* 984 F.2d 124 (4th Cir.1993); *Krieger v. J.E. Greiner Co.*, 282 Md. 50, 70–73, 382 A.2d 1069 (1978) (Levine, J., concurring); *Brady v. Parsons*, 82 Md.App. 519, 534–35, 572 A.2d 1115 (1990), *aff'd*, 327 Md. 275, 609 A.2d 297 (1992) (holding that the defendant was potentially liable under Restatement § 324A because he assumed a duty to exercise reasonable care in performing services for the decedent's protection). *See also Arnold's Hofbrau, Inc. v. George Hyman Constr. Co.*, 480 F.2d 1145 (D.C.Cir.1973).

Appellants' argument is premised upon the fact that there was no prior criminal activity on the premises that in turn might have supported the jury's finding. Even though there was "no prior criminal activity" on the premises per se, there is ample evidence to show that appellants should have been aware that something irregular was going on at the premises. Appellee reported two prior separate instances where someone had intruded, the last one occurring the day before the assault. Specifically, appellee stated that she was awakened by "two men standing on the fire escape looking in [her] bedroom window." The record also indicates that these instances were reported to Fink and ultimately to McCarthy. Also, on the day of the assault, appellee clearly notified Rock, and BHP, of the presence of the intruder in her apartment. Indeed, Carter and McCarthy went to the premises, chatted with the intruder, and even introduced him to appellee. Appellee's testimony also amply indicates that she was exasperated with these intrusions into her apartment and, but for the intervention of Carter and McCarthy, she would have called the police and not returned to her apartment.

Additionally, we think that the instructions given were the correct statement of law based on the evidence presented and did in fact fairly cover the requested instructions. *Myers v. Alessi*, 80 Md.App. 124, 560 A.2d 59 (1989). Instructions not founded on evidence presented during the trial are considered improper abstraction. *Moats v. Ashburn*, 60 Md.App. 487,

493, 483 A.2d 791 (1984) (*citing Baltimore Transit Company and Penny v. Pue*, 243 Md. 256, 220 A.2d 551 (1965)). In fact, the Court of Appeals has noted

[T]here can be little doubt that all parties to a law suit are entitled to have the jury properly instructed upon their theories of the case. But this statement presupposes that evidence has been adduced to support the theory of any particular party. The trial courts, in presenting their instructions to the juries, are not required to give the juries merely abstract statements of the law that have no relation to the facts of the case being tried.

*Schaefer v. Publix Parking*, 226 Md. 150, 152–53, 172 A.2d 508 (1961) (citations omitted).

The following exchange, which took place after the two parties had rested, is instructive:

Mr. Huber: Your Honor, on behalf of the defendant E.G. Rock, Inc., I would again move for a judgment in its favor on the basis that the plaintiff's evidence fails, and the evidence in totality fails to establish a claim upon which legal relief can be granted.

The law applicable to a landlord's responsibility is prior criminal activity, coming out of the *Scott v. Watson* case, to the extent that the record is devoid of knowledge of criminal activity having occurred—

The Court: I don't want to spend a lot of time on this, and I don't want to put words in anybody's mouth, but I don't think the plaintiff's theory has anything to do with that in this case.

What's the plaintiff's theory[?]

Mr. Thompson: Your Honor, I think it's briefly stated, our theory is that [Rock] in this case voluntarily or by some management agreement that I think there is some evidence of accepted a duty to investigate [Appellee's] complaint about this intruder; that [Rock] or [Carter] did not follow through with it; that her negligence in not following through with it resulted in the harm to [Appellee]. And that would be our theory against E.G. Rock.

As the above colloquy demonstrates, appellee's case is founded upon an assumption of duty by appellants rather than the existence of any prior criminal activity on the premises. This gratuitous assumption of duty is what forms the basis of appellee's claim because appellee directly relied on the assertions of appellants. *See* Restatement (Second) of Torts § 324A (1965); *Sheridan v. United States,* 969 F.2d 72, 74 n. 3 (4th Cir.1992) ("assumption of a duty, where none generally exists, and consequent potential liability under Maryland law are governed by [§ 324A]").

Appellants' requested instructions also do not adequately reflect the law in *Scott.* In *Scott,* the third question dealt with the duty imposed upon a landlord to protect tenants from criminal activity if the landlord has undertaken specific measures to protect his tenant. The Court of Appeals noted that "improper performance of such a voluntary act could in particular circumstances constitute a breach of duty." *Scott,* 278 Md. at 171, 359 A.2d 548. Appellants' requested instructions do not take into account the "voluntary act" aspect of appellee's argument. Even in *Scott* the Court of Appeals recognized that

[t]he duty of a landlord to exercise reasonable care for the safety of his tenants in common areas under his control is *sufficiently flexible* to be applied to cases involving criminal activity without making the landlord an insurer of his tenant's safety.

*Scott,* 278 Md. at 169, 359 A.2d 548 (emphasis added).

In the present case, appellee has argued that Rock and BHP "voluntarily assumed" a duty under § 324A of the Restatement (Second) of Torts. The jury heard the evidence and found appellants negligent. Nothing in this opinion is intended to hold that the landlord is an insurer of the premises. This is consistent with *Scott,* since we are not recognizing a "special duty" to be imposed upon the landlord to protect the premises against crimes perpetrated by third parties on the premises. Accordingly, we hold that appellant's requested instructions do not correctly state the law under their theory

of the case, and the law as proposed by appellants is not applicable in light of the evidence before the jury.[8]

## B. *The Indemnity Issue*

At the close of evidence, the court heard several motions in an attempt to clarify the issues before it. Appellant Rock appeals one of the decisions of the court. Specifically, it contends that the trial court erred in not giving instructions pertaining to its indemnity claim against appellant BHP. Three different arguments are proposed in support of this claim: (1) contract; (2) doctrine of principal and agent; and (3) doctrine of active/passive negligence. We address each argument separately.

### 1. *Contract*

Rock asserts that Count II of its counter-claim against fellow defendant BHP sought indemnity based upon an actual or implied agreement between the two parties. In pertinent part, Count II stated:

WHEREFORE, the Counter Plaintiff [Rock] prays that judgment be entered against Counter Defendant [BHP] for the total amount of any judgment rendered against the Counter Plaintiff[ ] in favor of the Plaintiff based on the actual or implied agreements of indemnity running from the Counter Defendants to the Counter Plaintiff.

Rock further notes that its motion to amend was based upon McCarthy's testimony that an existing contract for 809 Cathedral Street was extended to the premises. Rock argues that its motion to amend sought to have the issue of the existence of the contract, and, ultimately, the indemnity provision therein, determined by the jury.

---

8. It is important to note that the events surrounding the litigation relate to both the Appellants. The Appellee has not suggested that she relied on Rock's rather than BHP's assertions, or vice-versa. Throughout the litigation, Appellee has consistently maintained that both parties were negligent. The record also indicates that the jury found both Appellants accountable on the negligence charge.

BHP contends that, in effect, Rock is amending its cause of action against BHP at a late date. They argue that the indemnity issue was not pleaded by Rock and allowing the motion to amend would unfairly prejudice them. In support of this argument, BHP states,

If [BHP] had known of [Rock's] intention to assert a claim for contractual indemnification it would have made significant changes in its trial strategy; namely, it would have objected to the introduction into evidence of, references to, or questions pertaining to prior management agreements or contracts between the parties. In addition, BHP would have elicited testimony from witnesses concerning the issue of contractual indemnification, *e.g.*, was indemnification a standard provision in management contracts or was it generally a negotiated term?

BHP also contends that the only piece of evidence introduced at trial establishing the alleged existence of a management contract was the testimony of McCarthy taken at a deposition on August 29, 1989. Further reference is made to the testimony of Carter and James Clare wherein both the "principals" testified that there was no management agreement for 115 West Monument Street.

■ Maryland Rule 2–341 requires that amendments be "allowed when justice so permits." We have previously stated that this rule indicates great liberality in the allowance of amendments, in order to prevent the substantial justice of a cause from being defeated by formal slips or slight variances. *Staub v. Staub*, 31 Md.App. 478, 356 A.2d 609, *cert. denied*, 278 Md. 735 (1976). Amendments that result in prejudice to the opposing party, however, should not be allowed. *Robertson v. Davis*, 271 Md. 708, 319 A.2d 816 (1974); *Wright v. Trotta*, 34 Md.App. 309, 367 A.2d 557 (1976).

■ The court engaged in the following exchange in trying to determine the exact motions it had pending in front of it:

The Court: I'm asking all these questions so I'll be able to understand the arguments on motions and be able to deal with them appropriately.

You have got a two count cross claim, one sounding in indemnity based on contract and one sounding in tort for contributions?

&ast; &ast; &ast; &ast; &ast; &ast;

Mr. Gunby: Your Honor, I don't see where count two makes out a claim for indemnity. I also don't think that there's any evidence of—in fact, I don't think—there is evidence certainly that there wasn't a written agreement running between Rock and BHP....

&ast; &ast; &ast; &ast; &ast; &ast;

The Court: ... you are relying upon an express contract or an implied contract, which creates contract indemnification, and what I'm saying is, there's no notice anywhere in that piece of paper to the co-defendant if that's what you're claiming.

This is when Rock decided to amend its cross-claim to assert indemnity from BHP. The court then proceeded to determine whether the motion to amend should be granted. Ultimately, the court concluded that it would deny the motion since "it would be fundamentally unfair to the co-defendant to permit for the first time after the evidence has been closed a claim based on contract, when throughout the life of this case which began in 1988, it has never been so articulated."

Appellant Rock suggests that allowing it to amend its pleadings would merely have allowed the case to be tried on its merits rather than on the niceties of pleadings. Appellant BHP stated that its trial strategy would have been significantly different if it had notice of the indemnification claim. BHP also states that Rock had been aware of the contents of McCarthy's testimony since 1989 and had not specifically alleged an indemnity claim. Having considered these facts, the trial court concluded that amending the pleadings would be prejudicial to Appellant BHP. We cannot say, based upon the evidence presented, that the trial court abused its discretion.

## 2. Agency

■ Appellant Rock argues that the court should have instructed the jury on the law of principal and agent.[9] Rock contends that it was merely an agent of BHP and should not be held independently accountable for negligence. Rock also asserts that any responsibility that may accrue to Carter is derivative of the contractual liability existing between appellee and BHP. Accordingly, Rock maintains that since it was an agent of a disclosed principal it should not incur any liability.

Rock, however, fails to recognize that its liability is founded in tort rather than contract. As stated in *Smith v. Sherwood,* 308 F.Supp. 895, 899 (D.Md.1970), an agent may be liable for his own acts of negligence regardless of whether the principal's identity has been disclosed. We conclude that we do not need to address the above argument since the trial court's instructions *did* adequately cover the agency issue.

The judge's instructions, in pertinent part, stated,

Now the defendants in this case are a corporation and a partnership and, of course, corporations and partnerships act through their employees. An employer is responsible for injuries caused to others by acts of its employees if the acts causing the injuries were within the scope of their employment. An employee is acting within the scope of the employment when the employee is performing services for

---

**9.** Rock's requested jury instructions No. 19 stated in pertinent part:

A principal is responsible for injuries and damages caused to others by acts of his agents if the acts causing the injuries and damages were within the scope of the employment. An agent is acting within the scope of his employment when he is performing services for which he has been engaged or when he is acting in furtherance of his principal's interest.

John McCarthy was acting as the agent of the defendants, Baltimore Historic Properties and Susquehanna Development Corporation, at the time the acts about which complaint is made by plaintiff[s] [occurred]. His principals, Baltimore Historic Properties and Susquehanna Development Corporation, are responsible if the employee did the acts about which complaint is made by plaintiff[s] if you should find such acts were the legal cause of the injuries and damages.

which he or she has been engaged or when the employee is acting in furtherance of the employer's interests.

We have previously held that "[i]t is firmly established that under Maryland Rule 2–520(c) a trial judge is not obliged to give a requested instruction if the matter is fairly covered in the instructions actually given." *Myers v. Alessi,* 80 Md.App. 124, 132, 560 A.2d 59 (1989) (citations omitted). We conclude that the matter is fairly covered by the instructions given by the trial court.

### 3. *Active/passive negligence*

Rock contends that even if Carter was negligent, its negligence was passive and the trial court "should have granted [Rock's] Counter-claim for indemnification." We have previously concluded that the trial court was correct in denying appellant Rock's requested jury instruction (issue 1) and denying appellant Rock's motion to amend (issue 2A). For the reasons mentioned therein, we conclude that the trial court was correct in denying instructions on Rock's active/passive negligence theory.

JUDGMENT AFFIRMED; COSTS ASSESSED TWO–THIRDS TO APPELLANT ROCK AND ONE–THIRD TO APPELLANT BHP.