**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SALLY THATCHER; ROBERT THATCHER,
Plaintiffs-Appellants,

v.

THE TC OPERATING LIMITED

No. 98-1253

PARTNERSHIP, t/a Town & Country
Apartments, the TC Hollows
Company,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-95-2549-WMN)

Argued: December 2, 1998

Decided: February 12, 1999

Before WILKINSON, Chief Judge, MURNAGHAN, Circuit Judge,
and HERLONG, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Guerdon Macy Nelson, LAW OFFICE OF G. MACY
NELSON, Towson, Maryland, for Appellants. William Carlos Parler,
Jr., PARLER & WOBBER, L.L.P., Towson, Maryland, for Appellee.

**ON BRIEF:** Mary Ellen Niles, SCHWARTZ & NILES, Glen Burnie, Maryland, for Appellants. Jennifer S. Cavey, PARLER & WOBBER, L.L.P., Towson, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

The instant case is an appeal by a residential tenant from a decision that the landlord of her apartment complex is not liable in negligence for failing to prevent her from being sexually assaulted in her complex's laundry room. The tenant, Sally Thatcher ("Thatcher"), contends that the landlord, TC Operating Limited Partnership ("TC"),[1] breached its duty to take reasonable measures to protect its tenants from crime, given reports of burglaries and other property crimes. Alternatively, Thatcher argues that the TC's voluntary decision to provide a lock for the laundry room door gave rise to a duty to maintain it, and that its failure to do so was a proximate cause of the sexual assault (i.e., the TC's failure increased the possibility of crimes against persons).

I.

Thatcher leased from TC an apartment in the Hollows apartment complex in Glen Burnie, Maryland. The tenancy began August 1, 1992 and extended for a term of one year. The Hollows is a twelve-building complex in which each building may contain as many as six units. In Thatcher's unit, the laundry room was on the basement floor while her apartment was on the second floor.

_____

[1] TC is titled as Town & Country Apartments, the entity from which Thatcher rented her apartment.

2

In addition to the Hollows, TC managed another Glen Burnie apartment complex named the Woodhill. The Hollows and Woodhill complexes are approximately one and a quarter miles apart, in different police precincts and separated by Route 100, a major thoroughfare. Moreover, the Woodhill is very near a shopping complex. Despite those differences, TC often directed tenants of the Woodhill to pay their rent at the Hollows, and various management and janitorial personnel serviced both facilities.

On the evening of January 14, 1993, Thatcher went to the laundry room to retrieve a rug from the dryer. The lock on the laundry room door was broken.[2] She entered the laundry room, which was approximately ten feet long and seven feet wide, and walked over to the dryer. Approximately ten seconds later, the assailant entered the room and sexually assaulted her.[3] Thatcher did not know the assailant, who has never been identified.

Thatcher instituted the suit underlying this appeal on August 30, 1995. TC moved to dismiss the claim, or in the alternative for summary judgment, arguing that Thatcher's sexual assault was unforeseeable as a matter of Maryland law. Thatcher responded by proffering numerous documents containing statements by tenants of the Hollows and Woodhill complexes that there were several property crimes committed both before and after Thatcher's assault. The district court granted TC's motion, concluding that the evidence proffered by Thatcher, even if true, is insufficient to make crimes of violence foreseeable to TC. Thatcher filed a timely appeal.

_____

[2] TC disputes Thatcher's assertion that the lock was broken. However, the district judge assumed it to be broken for the purposes of TC's motion to dismiss/summary judgment. As is demonstrated below, Thatcher did not present enough evidence to create a genuine issue as to whether the condition of the lock would have made a difference.

[3] TC also disputes Thatcher's assertion that she was sexually assaulted. In fact, the police officer investigating the matter submitted an affidavit stating that she did not believe that the attack occurred. However, for the purposes of TC's motions, the district court assumed that Thatcher was attacked, as will we.

II.

We review de novo the district court's grant of a motion to dismiss for failure to state a claim. See Flood v. New Hanover County, 125 F.3d 249, 251 (4th Cir. 1997). Likewise, our review of the grant of summary judgment is also plenary. See Evans v. Technologies App. & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). In reviewing the grant of summary judgment (into which the motion to dismiss has been converted, see FED. R. CIV. P. 12(b)(6)), we view all facts and reasonable inferences in the light most favorable to the nonmovant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587 (1986). As we are sitting in diversity -- Thatcher is a citizen of Florida while TC is a citizen of Maryland -- the rule of Erie v. Tompkins, 304 U.S. 64, 78 (1938), requires that we apply the law of the forum state, Maryland.

In finding that TC was not liable to Thatcher, the district court concluded that evidence of violent crimes at other apartment complexes in Glen Burnie owned by TC was irrelevant to any duties TC owed to the tenants of the Hollows. Moreover, it held that because the crimes reported at the Hollows were property crimes and not crimes against people, they were insufficient as a matter of law to make it foreseeable that violent crimes (such as rape) would occur in TC's common area. The district court based its reasoning on the Court of Appeals of Maryland's decision in Scott v. Watson, 359 A.2d 548, 550 (Md. 1976). As that is the seminal case in Maryland discussing the extent of a landlord's duty to its tenants, we begin there.

In Scott, the plaintiff (the decedent's daughter) brought a wrongful death suit in federal district court against the decedent's landlord alleging that the landlord's failure to provide sufficient security measures proximately caused the murder of the decedent in the underground parking facility of the decedent's apartment building in Baltimore. Realizing that the question was a novel one under Maryland law, the district court certified three questions to the Court of Appeals of Maryland ("the state court").

The first question asked whether, under Maryland law, a landlord had a duty to protect its tenants from the criminal acts of third parties in common areas of the premises. The state court answered this ques-

4

tion in the negative, reasoning that such a duty effectively would make landlords insurers of their tenants' safety. See id. at 553. Rather, the state court concluded, the duty that a landlord owes its tenants is "to use reasonable diligence and ordinary care to keep the portion retained under his control in reasonably safe condition." Id. at 552 (citation omitted).[4]

The second question asked whether the landlord's knowledge of criminal activity on the premises or in the neighborhood creates a duty to protect the tenant. See id. at 553. The court held that the duty of reasonable care applied and was flexible enough to consider the landlord's knowledge and to require it to take reasonable steps to reduce the risk of harm to the tenants. See id. However, that duty only existed to the extent that the dangerous conditions existed on the landlord's premises; landlords have no control over-- and thus no liability for -- neighborhood crime. See id.

We pause here because a great deal of Thatcher's appeal raises the question of whether the landlord's knowledge in the instant case is sufficient to impose upon it a duty to take further security measures. In answering that question, we look to the Scott court's view of the facts in that case. Although it did not apply the law it enunciated to the facts of the case, its statements are telling.

The multistory complex in which Scott was murdered contained retail stores open to the public on the ground floor and apartments on the floors above the ground floor. There were two outdoor parking lots and an underground garage. The parking garage could be entered through a "sliding steel door" which was operated by "an electrocard device."[5] Id. at 550.

In addition to the "electrocard device," the landlord supplied the following security devices: two closed circuit television cameras surveilling the building's basement retail shops; a guard on duty from 10 p.m. to 6 a.m. who patrolled the inside of the building four times a

_____

[4] Thatcher does not argue that TC had a general duty to protect her from the criminal acts of third parties.
[5] Approximately 450 tenants and their guests had access to the parking garage. Id. at 550.

5

night and the outside, including the garage, two times a night; a switchboard operator who monitored the television system and main entrance; and a doorman who parked the residents' cars for them if the tenants so desired. See id. at 550-51.

Despite those security measures, all of which were voluntarily undertaken, there were reports of crime on the premises. For example, in the three month period prior to the murder, there were two burglaries of apartments, a robbery of a retail store and rape of the employee, two auto thefts (one of a car parked on the street in front of the complex), and two assaults on persons standing near the apartment building. See id. at 554. In addition, there were several prior complaints of illegal entries into apartments. See id. Despite that criminal activity, however, the court expressly noted that the landlord had no knowledge that any violent crime or threat thereof had been perpetrated in the common areas of the apartment building portion of the complex. See id.

Given the Scott court's conclusions as to the criminal activity abounding in that case, the district court in the instant case correctly concluded that evidence of drug sales, burglaries and sexual assaults (including in the laundry room) at the Woodhill-- even if true -- were irrelevant. It reasoned that because the Scott court held that neighborhood crime could not be considered, crime that occurred at the Woodhill -- a different apartment complex-- certainly could not be considered.

Thatcher contends that her case fits within the Scott rule. She first argues that the crimes at the Woodhill are relevant because TC treated the Hollows and the Woodhill as "sister properties" and many of the management and staff personnel overlapped. Second, she urges consideration of the other crimes based on the Scott court's statement that the only relevant crimes are those occurring on the landlord's "premises." Id. at 554. Since the Woodhill and Essex are also TC's premises, she argues, they fit the definition. Finally, she argues that the landlord's duty to take reasonable measures to prevent crimes against persons or property in the common areas if it knows or should know that they occur, see id., requires the conclusion that the property crimes here were sufficient to put TC on notice that the common areas were susceptible to crimes against persons.

6

However, the Scott court's rationale supports just the opposite conclusions. As for the first two arguments, it is important to note that the Woodhill and Hollows complexes are: (1) more than a mile apart; (2) separated by a four lane highway (State Route 100); and (3) in different police precincts. TC's decisions to use the same maintenance personnel for both complexes and to allow Woodhill residents to bring their rental payments to the Hollows' rental office do not change the fact that the complexes are two distinct entities in two distinct neighborhoods. When we consider that the bulk of the criminal activity in Scott occurred on the same premises -- if not the same common area -- as the murder, see id. at 550-51, a holding that criminal activity occurring more than a mile away from the relevant premises, in a different complex and in a different neighborhood was relevant would be incongruous. Moreover, Thatcher's argument would have us hold that all of an owner's real property, although located all over the world, constitutes one premises.

Thatcher's third argument is similarly flawed. We note that in Scott, a car was stolen from either the underground garage (the one in which Scott's body was found) or the lobby-level garage less than three months before the murder. See id. at 554. Despite that property crime, which may have occurred in the same common area as the murder, the Scott court found that "prior to Scott's death, the landlord had no knowledge that any tenant or invitee had been the victim of a crime involving physical harm (or threats) occurring in the common areas within the apartment building." Id. That finding suggests that property crimes such as the fire in the laundry room of the Essex, a TC managed apartment building several miles away, and the alleged sexual assaults at the Woodhill are insufficient to establish notice to TC as to activities in the common areas of the Hollows.**6**

_____

**6** Thatcher notes that there were reports of vagrants congregating under the stairwells of the Hollows. However, there is no evidence that any vagrants that may have been there committed any crimes or even approached any of the tenants of the Hollows. As for the sexual assaults at the Woodhill, the resident who stated that two sexual assaults occurred admitted that she had no personal knowledge of them, and in any event, did not state whether the perpetrators were residents of the Woodhill, with lawful access to the laundry room, or total strangers.

7

Moreover, in cases more recent than Scott where Maryland's courts have imposed liability upon the landlord, the crime actually committed was very similar to the previous criminal activity that gave the landlord notice of the dangerous conditions.**7** For example, in New Summit Associates v. Nistle, 533 A.2d 1350, 1358 (Md. 1987), workers who were remodeling an apartment adjacent to the plaintiff's created peepholes in the plaintiff's bathroom wall. See id. at 1353. The landlord knew that the construction workers had created peepholes in some of the other apartments they had remodeled, but failed to warn the plaintiff or patch the holes in her mirror when she complained. See id. Thus, the landlord was liable for the plaintiff's emotional injuries.

In Rock v. Danly, 633 A.2d 485 (Md. App. 1993), the court affirmed a jury finding of liability against a landlord where an attack on a tenant near her apartment occurred after numerous incidents of suspicious -- although not necessarily criminal-- behavior, by workers in her apartment. See id. at 488. Specifically, the plaintiff noticed some workers, who were lawfully in the building remodeling an apartment, on the fire escape outside her apartment looking in her window, see id., and that a worker had been inside her apartment without her knowledge. See id. On one occasion, in the middle of the night, a worker entered her apartment. She awoke before he left the foyer, and asked him to leave. See id.

In fact, the attack itself ensued after the plaintiff saw a worker leaving her apartment with some of her belongings and chased him into the hallway. See id. During the entire period, management promised to investigate the matter and identify the workers. See id. Thus, in that case, the suspicious activity occurred in or very near the place where the actual assault occurred, and the assault itself was the direct result of that activity. That is not the case here.

_____

**7** One case prior to Scott appeared to require even more similarity than Scott. In Nigido v. First National Bank of Baltimore, 288 A.2d 127 (Md. 1972), the Maryland Court of Appeals stated in a case involving a customer of a bank who was injured during a robbery, that the bank's ability to foresee a robbery did not mean that it could foresee a customer being shot. See id. at 128.

8

III.

The district court also concluded that the failure to fix the lock was not the proximate cause of the sexual assault on Thatcher. In reaching its conclusion, the court reasoned that although, under the law as explained in Scott, TC did assume a duty, Thatcher's failure to establish that the door was fully closed was fatal to her causation argument. We agree with the district court's conclusion.

The third question certified to the Maryland Court of Appeals in Scott was whether a landlord assumes a duty to protect his tenants from harm by third parties when he voluntarily undertakes specific measures to so protect them. See id. at 554-55. The court answered that question in the affirmative, holding that such a voluntary undertaking could, under the proper circumstances, give rise to a duty. See id. at 555. However, the court cautioned that the plaintiff must still establish proximate causation, and may do so only by showing that the breach of duty "enhanced the likelihood of the particular criminal activity which occurred." Id. at 556.

While it is a closer question than the others, Thatcher cannot prevail. Assuming that the TC's decision to put a lock on the door gave rise to a duty and that TC breached that duty by failing to repair the lock, Thatcher still cannot establish that a working lock would have made a difference. As she cannot establish that the failure of the lock was the cause-in-fact of the assault, she cannot establish proximate causation.

Thatcher's contention is that there is an issue as to whether the door actually closed, because she heard the door open. If the door closed completely, then a properly functioning lock would arguably have deterred the assailant.

Although Thatcher testified that she heard the door open, that fact alone is not enough to preclude summary judgment. We note that she twice testified that she did not see the door shut behind her and had no idea of whether the assailant caught the door before it closed. That she neither saw nor (presumably) heard the door close despite being in a small room[8] for approximately ten seconds is significant. That

_____

[8] She described the room as being about ten feet long and seven feet wide.

9

significance is increased because Thatcher is the only one of the two persons (the other being the as yet unidentified assailant) who could know whether the door was completely shut. Moreover, nothing in the record gives us any indication that the door makes a sound only when opened after being shut completely. In light of the absence of evidence establishing that the door may have been shut completely, Thatcher cannot avoid summary judgment.

Moreover, Thatcher has presented almost no evidence that the assailant was someone who did not have lawful access to the laundry room or building. Thatcher asserts that the assailant could not have been a tenant because he had an offensive smell and she did not recognize him. Her only description of the assailant to the police very nearly matched the description of a tenant who lives on her floor.[9] While the tenant has been exonerated, Thatcher's description illustrates the point that the assailant could be anybody-- including a tenant. Tenants, of course, would have lawful and complete access to the laundry room. Moreover, there is no evidence that the assailant was not a guest of a tenant or member of the maintenance staff, each of whom would have had access to the laundry room. In short, there is no evidence that a working lock would have prevented her injury.[10] Therefore, we affirm the district court's conclusion as to this issue.

_____

[9] We hasten to note here that there is absolutely no evidence that the tenant was the assailant. In fact, he cooperated fully with the police and allowed his photograph to be taken for identification purposes. When shown his photo, Thatcher did not identify the tenant as the assailant.

[10] Thatcher also contended that other safety measures, such as a glass panel on the door through which she could have seen the attacker coming, should have been installed. However, no statutory or common law authority specifically requires those measures, and there has been no determination that they were reasonably necessary under the circumstances. Moreover, those measures would not have helped her anyway. She testified that she did not see anyone near the laundry room when she entered it, and the assailant himself came into the room after her. Thus, before she entered the room, the glass panel would have revealed an empty laundry room. After she entered, she could not have used the glass panel because she was not facing the door; had she been facing it, she would know whether it shut completely.

10

CONCLUSION

Although we express sincere regret for the terrible assault on Mrs. Thatcher, we find that there is no basis upon which to impose liability on the landlord. Therefore, we affirm the district court's decision to grant summary judgment to TC.

AFFIRMED

11