647 A.2d 1284

**CHAMBCO, A DIVISION OF CHAMBERLIN WATERPROOFING & ROOFING SYSTEM, INC.**

v.

**URBAN MASONRY CORPORATION.**

**No. 45, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Sept. 29, 1994.

Herman M. Braude (Braude & Margulies, on the brief), Washington, D.C., for appellant.

Stephen M. Seeger (Lyon and McManus, on the brief), Washington, D.C., for appellee.

Argued before GARRITY, WENNER and CATHELL, JJ.

CATHELL, Judge.

Appellant, Chambco, a Division of Chamberlin Waterproofing & Roofing System, Inc. (Chambco), filed suit in the Circuit Court for Montgomery County against appellee, Urban Masonry Corporation (Urban), in negligence. Appellant performed roofing, waterproofing, and flashing work on a project in Washington, D.C. Appellant alleged that appellee damaged its property when appellee performed masonry work on the same project. In a court trial, the court found for the appellee. Appellant presents three issues for our review:

1. Whether Chambco has established a valid cause of action based on negligence.

2. Whether the dismissal based on the theories of *res judicata* and collateral estoppel was supported by facts.

3. Whether a judge could raise the issue of *res judicata* or collateral estoppel *sua sponte* based on mere recitation of the affirmative defenses without any supporting facts.

### Facts

We shall abbreviate our recitation of the significant facts in light of our resolution of the questions presented.

Chambco, as a subcontractor, entered into a contract with a general contractor, HCB Contractors, a Texas limited partnership with the Beck Company, as general partners.[1] The work to be performed by Chambco related to roofing, flashing, sealing, and water proofing, etc. In addition to the normal provisions in such contracts as to performance, payment, etc., the contract, prepared by Beck, required:

> Subcontractor agrees at its own expense to (1) take all necessary precautions to protect the work of other trades from any damage caused by Subcontractor's operations, and (2) to watch over, care for, and protect from damage or injury by any cause whatsoever, all of Subcontractor's work, complete or otherwise and all of its materials, supplies, tools, and equipment at or near the Project. Subcontractor agrees, without loss or damage to Contractor, to make good any loss or damage to any and all such work, materials, supplies, tools, and equipment up to the final acceptance of the entire Project by Owner.

Urban had entered into a separate contract with Beck to perform masonry work on the same project. Its subcontract contained a similar (if not exact) provision.

During construction, some of the work performed by Urban allegedly damaged the prior work performed by Chambco. Chambco, pursuant to the terms of its subcontract, made claims (back charges) against Beck to compensate Chambco for the work it had done to repair same. Meanwhile, Urban, as a result of disputes as to payment and change orders, instituted suit against Beck in the Superior Court of the District of Columbia. Beck counterclaimed against Urban and included in its counterclaim the compensation (damages, etc.) that Chambco was claiming for its repair work. Beck also

---

1. We shall hereafter refer to HCB Contractors, the general contractor, as Beck.

filed a third-party complaint against Chambco. Chambco answered and filed its own claim in those proceedings, including its claims for the repair work that had been, it alleged, necessitated by Urban's negligence.

Twenty months later, Chambco instituted the instant case against Urban.

On the day of the trial in the District of Columbia case, Chambco settled its claims with Beck, and those parties allegedly entered into a written settlement agreement. The District of Columbia suit continued between Beck and Urban and a final judgment was entered in that case disposing of all of Beck's claims against Urban, including its claims arising out of the work performed by Urban that allegedly caused Chambco's damage.

What purported to be the settlement agreement between Beck and Chambco was admitted into evidence below as plaintiff's exhibit No. 12. The exhibits themselves were not forwarded with the record. The record extract, however, contains, at page 74, what is referred to as an agreement. It contains no indication that it was ever offered or received in evidence. Whatever it is, it was executed after the written settlement agreement. It notes that:

> On March 1, 1993, Chambco ... and HCB [Beck] entered into a written settlement concerning their disputes.... Pursuant to said written agreement, Chambco settled with HCB for $150,000, which HCB paid to Chambco on March 12, 1993....

That document, which, as presented in the extract, contains no indication of when it was made or whether it was ever admitted but does contain a provision that the actual settlement agreement of March 1, 1993, was attached to it as Exhibit A. Exhibit A, however, was not attached to the document included in the extract, and we have not found it in the record. Thus, the actual written settlement agreement is not available for our review.

The writing found on page 74 of the extract is merely a document that purports to state what the prior settlement

agreement of March 1st provided. There is no indication of when this document was prepared and executed other than that it was after the original written settlement agreement. This document could have been prepared the day before, or, in fact, as far as we know,[2] even after the trial of the case *sub judice.* We note initially that appellant challenges the trial court's *res judicata* findings in this appeal. That settlement agreement, not a subsequent memorandum of what it provided, appears to be instrumental for a full consideration of the *res judicata* issue. It is not what the appellant and Beck said it says that would be determinative of the issue in this forum, it is what this Court holds that the agreement itself means that would resolve the issue. Md. Rule 8–501(c) **"Contents"** states, in pertinent part:

> The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal.

In *Bland v. Larsen,* 97 Md.App. 125, 627 A.2d 79 (1993), Bland asserted on appeal that the trial court had erred in failing to apply the doctrine of unclean hands. We declined to find any abuse of discretion or error on the part of the trial judge, noting:

> We are unable to find support for Bland's allegations in the record extract, other than the discrepancy in Larsen's testimony. There is no indication that Larsen was guilty of "willful wrongdoing." As to Bland's allegations ... mere bald allegations without evidentiary support will not be considered. . . .

*Id.* at 137, 627 A.2d 79.

We thus question whether appellant has properly presented the issue of the *res judicata* effect of its written settlement agreement with Beck, in that the agreement, as far as we can ascertain, is nowhere presented to us. As we shall resolve the

---

**2.** Appellee apparently has failed to discern that the document on E.74 is not the settlement agreement but a subsequent document signed by Beck and Chambco. On page 8 of appellee's brief, it refers to E.74 as containing the settlement agreement.

matter on other grounds, however, we need not further address questions two and three.

■ We next note that, generally, materials or items incorporated into a building during construction become the property of the owner of the property where the building is situated, subject to the right of contractors, subcontractors, and materialmen to liens against the property.

■ The Court of Appeals in *Schofer v. Hoffman,* 182 Md. 270, 34 A.2d 350 (1943), reiterated the law of fixtures, saying:

[T]he rules for ascertaining whether an installation on or in real property is or is not a fixture are as follows:

"The term 'fixture' is generally used in reference to some originally personal chattel which has been actually or constructively affixed either to the soil itself, or some structure legally a part of such soil.

"The tests by which a fixture is determined are generally these:

"(1) Annexation to the realty, either actual or constructive;

"(2) adaptation to the use of that part of the realty with which it is connected;

"(3) the intention of the party making the annexation to make the article a permanent accession to the freehold,— this intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed."

*Id.* at 273–74, 34 A.2d 350. The Court of Appeals more recently cited *Schofer* for its definition of a fixture in the tax case of *State Department of Assessments and Taxation v. Town and Country–Woodmoor, Inc.,* 256 Md. 584, 587, 261 A.2d 168 (1970), and Judge Motz, for this Court, recently reiterated that definition as applicable in Maryland in our tax case of *State Department of Assessments and Taxation v. Metrovision,* 92 Md.App. 194, 201, 607 A.2d 110 (1992).

■ Thus, it is clear that, unless agreements exist to the contrary—and none are proffered in the case at bar—roofing, waterproofing, etc., incorporated into a building during construction become annexed to that building. Upon annexation, they become the property of the owners. Appellant makes no viable argument to the contrary. Indeed, its subcontract contains several provisions tacitly acknowledging the transformation of its efforts and materials into this building. See the following paragraph of that agreement:

> Paragraph 11.9 Subcontractor will save and keep the Project . . . free from all mechanic's liens and all other liens by reason of the Work . . . or other things used therein.

Paragraph 5.4 even made provisions for the owner to acquire title to stored materials not yet incorporated:

> [As to material to be, but not yet incorporated into the project for which payment is made] . . . Subcontractor shall . . . make any provisions necessary . . . to ensure and protect Contractor's or *Owner's title* and right of possession and access to such materials. [Emphasis added.]

Paragraph 2.56.2 provided further:

> [P]ayments for Stored Materials may be conditioned . . . [on] such other procedures satisfactory to Owner to *establish the Owner's title* and to insure and otherwise to protect the Owner's interest. . . . [Emphasis added.]

Additionally, the contract provisions as to the liens, etc., also indicate the nature of the incorporation of the materials and labor into the building and, thus, into the owner's ownership. These remedies are, as they relate to the property, generally limited to mechanics' lien remedies. In that regard, section 9–101 "Definition" of Subtitle 1 Mechanics Liens of Title 9 Statutory Liens on Real Property provides in part:

> (d) *Contractor.*—"Contractor" means a person who has a contract with an owner.

> . . . .

(g) *Subcontractors.*—"Subcontractor" means a person who has a contract with anyone except the owner or his agent.

Owner is defined in (f) as:

"Owner" means the owner of the land. . . .

We conclude that, once Chambco's product was incorporated into the project, it was no longer the property of Chambco but was, instead, the property of the owner. Therefore, even if the flashing installed by Chambco was in fact damaged by Urban, it was not Chambco's property being damaged. Chambco's entire claim can, therefore, only be premised upon economic loss—not damage to its property.

### The Law

■ In its brief, Chambco cites several foreign cases as authority for the maintenance of this suit upon negligence grounds. As we review those cases, they are factually distinct and/or inapposite. Appellant sums up his recitation of foreign authority by summarizing the holding in *Davison and Jones v. County of New Hanover*, 41 N.C.App. 661, 255 S.E.2d 580, 584, *cert. denied*, 298 N.C. 295, 259 S.E.2d 911 (1979): "According to the Court of Appeals of North Carolina, this liability arises from the negligent breach of a common law duty of care **flowing from the parties' working relationship.**" Appellant then acknowledges that

[w]hile Maryland has not addressed the issue of whether a contractor's duty of due care extends to those who may foreseeable [sic] be subjected to the risk of mere property damage, the above-mentioned broad general rule has been adopted by Maryland law.

citing *Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.*, 308 Md. 18, 517 A.2d 336 (1986) (hereafter *Whiting–Turner* ).

First, as we read *Whiting–Turner*, it did not go as far as appellant suggests and was, as we shall explain, a narrowly drawn opinion that that Court and this Court have continually refused to expand. Secondly, as we have indicated, Chamb-

co's property was not damaged. By the time the alleged damage occurred, the property was no longer Chambco's. Thus, whatever damage was suffered by Chambco was limited solely to economic damages. With that in mind, we turn to *Whiting–Turner.*

In the seminal case of *Whiting–Turner,*[3] the Court described the issue as:

> [W]hether a builder or architect may, under any circumstances, owe a tort duty of reasonable care to a person with whom he has no contractual privity.

308 Md. at 24, 517 A.2d 336. The Court noted that early law had been that architects and builders, in the building context, generally had no duty to those with whom they had no contractual privity. Some exceptions were identified as: defects concealed by deceit, imminent or inherently dangerous conditions, nuisances per se, and some contractually created duties.

The Court, after distinguishing *Marlboro Shirt Co., Inc. v. American Dist. Tel. Co.,* 196 Md. 565, 77 A.2d 776 (1951), and discussing Maryland and foreign authorities, held:

> We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the

---

**3.** We describe *Whiting–Turner* as a seminal case because it was considered by the bar to have been a significant departure from the holding in *Marlboro Shirt v. American Dist. Tel. Co.,* 196 Md. 565, 77 A.2d 776 (1951). In *Whiting–Turner,* the Court of Appeals explained that in *Marlboro Shirt* there had been no claim of personal injury, 196 Md. at 29; that it had said in *Matyas v. Suburban Trust Co.,* 257 Md. 339, 263 A.2d 16 (1970), that the language in *Marlboro Shirt* had been broader than required and one year after *Marlboro Shirt* in *Otis Elevator Co. v. Embert,* 198 Md. 585, 84 A.2d 876 (1951), it had not followed *Marlboro Shirt. Id.* at 30, 517 A.2d 336. We thus conclude that the *Whiting–Turner* Court did not follow the literal language of *Marlboro Shirt* because it perceived that the *Marlboro Shirt* Court did not mean for its decision to have as broad an application as its literal language indicated.

action will lie for recovery of the reasonable cost of correcting the dangerous condition.

*Id.* at 35, 517 A.2d 336. It immediately noted, in footnote 5:

It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient.

*Whiting–Turner* was first revisited in a building construction context[4] in the case of *Village of Cross Keys, Inc. v. United States Gypsum Co.*, 315 Md. 741, 556 A.2d 1126 (1989). There, the developer and designer sought indemnity or contribution by impleading the designer of a brick veneer curtain wall system that had allegedly permitted water damage in a project when that water damage had caused suit to be filed against the developer and architect by the Council of Unit Owners of Harper House Condominiums. The Court, early on, noted that the claim of tort duty put forth there "generates the specter of 'liability in an indeterminate amount ... for an indeterminate time to an indeterminate class'...." *Id.* at 744–45, 556 A.2d 1126. "[W]e are asked to revisit the question of economic loss versus risk of physical harm, and the impact of each type of damage upon the question of how far a duty should extend." *Id.* at 745, 556 A.2d 1126. Nevertheless, the Court found it unnecessary to visit *Whiting–Turner* in light of its finding that the builder and developer had not used the process claimed to be defective in accordance with the directives of the manufacturer and the Court chose as a matter of public policy not to "impose a tort duty ... under these circumstances." *Id.* at 760, 556 A.2d 1126.

---

**4.** It was first subsequently noted in *B.N. v. K.K.*, 312 Md. 135, 152, 538 A.2d 1175 (1988), in a case involving the transmission of a venereal disease.

*Whiting–Turner* was then cited in the negligence case of *Casper v. Charles F. Smith & Sons,* 316 Md. 573, 560 A.2d 1130 (1989), a case in which some children had suffered injuries by falling through ice over a waterway that had recently undergone construction. The plaintiffs contended that the construction had been wrongly performed and, had the contract between the city and Smith been properly performed, the injuries would not have occurred. They sued the city, arguing that the city had a duty to insure that its contract with Smith was not breached. The Court noted at 577–78, 560 A.2d 1130:

> Turning first to the argument that a duty flowed from the contract, we find no merit in that contention.... Similarly, ... [i]f the deepening of Moore's Run breached a duty owed by the city to the plaintiffs, ... it is not made actionable simply because it occurred as a result of a breach of a contract. [citing *Whiting–Turner, supra,* and *Matyas v. Suburban Trust Co.,* 257 Md. 339, 263 A.2d 16 (1970) ]

The next discussion of *Whiting–Turner* by the Court of Appeals occurred in *Erie Ins. Co. v. Chops,* 322 Md. 79, 585 A.2d 232 (1991), a case involving statutory notice of the cancellation of an insurance policy. The Chopses claimed that, because the insurance company had not complied with a statutory requirement that it notify the Motor Vehicle Administration of the cancellation of the policy, the insurance company should remain liable for injuries incurred by the Chopses in an accident occurring after the policy was cancelled, where fault allegedly lay with company's former policyholder. The Court noted its earlier comments from *Jacques v. First National Bank,* 307 Md. 527, 515 A.2d 756 (1986):

> Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent.... where the risk created is one of personal injury, no such direct relationship need be shown....

322 Md. at 86, 585 A.2d 232 (quoting *Jacques,* 307 Md. at 534–35, 515 A.2d 756). The Court then held:

> [T]he principal risk against which the statute is directed is the risk of economic loss.... Here, no intimate nexus existed between Erie and the Chops [sic]. There was neither contractual privity nor its equivalent.

322 Md. at 87, 585 A.2d 232.

*Eisel v. Board of Educ.,* 324 Md. 376, 597 A.2d 447 (1991), was the next in the line of cases citing *Whiting–Turner.* It may be construed as an expansion of *Whiting–Turner,* though it appears primarily to be used by the Court as additional authority supporting the language of *Jacques, supra.* In *Eisel,* a school counselor had failed to intervene in circumstances where a child had threatened suicide. The counselor had not informed the parents. The child committed suicide and the primary issue was whether a duty existed between either the counselor and the parents or the school and the parents. Thus, the issue involved the special relationship aspect of the concept of duty in negligence law generally and should not customarily be grouped as a *Whiting–Turner* case. The Court ultimately held that a special relationship existed by noting that, under its cases, a school was *in loco parentis* in respect to children under its care. *Id.* at 384, 597 A.2d 447. The Court cited *Whiting–Turner* as "recognizing a duty against architects, enforceable by recovery for economic loss, if building conditions present a clear risk of death or personal injury." *Id.* at 391–92, 597 A.2d 447. The mention of *Whiting–Turner* in *Eisel,* a case totally unrelated to building construction, was dicta there, and, as we perceive it, did not expand the concept of *Whiting–Turner.*

*Brady v. Ralph M. Parsons Co.,* 327 Md. 275, 609 A.2d 297 (1992), was the next Court of Appeals case citing *Whiting–Turner.* Brady, the survivor of a deceased workman, sued Parsons in respect to the worker's death, alleging that Parsons had negligently performed its safety responsibilities. The deceased had been working for a subcontractor of the general contractor, Hensel Phelps Construction Company.

Mass Transit Administration (MTA) was the owner of the project. MTA also had a separate contract with Parsons to serve as construction manager and with another contractor, an insurance company, concerning insurance coverage. Included in Parsons's responsibility was the obligation to develop and oversee the application of safety procedures. Ultimately, Brady's survivors sued Parsons for the negligent performance of these safety duties.

When the case arrived at our Court, we held (*Brady v. Ralph M. Parsons Co.*, 82 Md.App. 519, 528–29, 572 A.2d 1115 (1990)), that Parsons owed an "assumed duty" to Brady, citing *Krieger v. J.E. Griener Co.*, 282 Md. 50, 382 A.2d 1069 (1978), and *Cutlip v. Lucky Stores, Inc.*, 22 Md.App. 673, 325 A.2d 432, *cert. denied*, 273 Md. 719 (1974). We noted that "[i]mposing a duty on those who have assumed the responsibility to comply with safety regulations simply reinforces the policy of holding liable those who have assumed a duty of due care." We then adopted what we termed "the assumed duty exception." 82 Md.App. at 529, 572 A.2d 1115. We, nevertheless, affirmed the trial court's judgment for Parsons in light of the contributory negligence/assumption of risk defenses.

In its *Brady* opinion, 327 Md. 275, 609 A.2d 297 (1992), the Court of Appeals likewise affirmed the trial court's (and our) decision on contributory negligence/assumption of risk grounds. Nevertheless, the Court commented on our discussion of duty under the circumstances, saying at 282, 609 A.2d 297:

> We note in passing, however, that there are significant questions concerning the existence and extent of a tort duty owed by Parsons to Brady which are not before us and which we do not address.... [T]his Court pointed out in ... *Whiting–Turner* ... and in *Matyas* ... that when parties contract with one another to undertake a duty which neither of them is under a legal obligation to perform, they may have a responsibility to each other for a breach of that agreement, *but a previously non-existent tort duty to third persons will not thereby be created.* [Emphasis added.]

Thus, the Court took the opportunity to point out what it then perceived as certain limits to the *Whiting–Turner* holding.

A recent Court of Appeals case in which *Whiting–Turner* is cited or explained is *A.J. Decoster Co. v. Westinghouse Electric Corp.*, 333 Md. 245, 634 A.2d 1330 (1994), where a chicken and egg producer sued the manufacturer of a defective backup power switch over the loss of 140,000 chickens. Decoster argued that it had adequately stated a cause of action because the loss of the chickens was a loss of property recoverable in a tort action and not an economic loss. The Court initially characterized the claim as a product liability claim. The Court then defined "economic" losses to include "the loss of value or use of the product itself, the cost to repair or replace the product, or the lost profits resulting from the loss of use of the product." *Id.* at 250, 634 A.2d 1330 (citations omitted). It also noted that its holding in *Whiting–Turner* had denied recovery under a negligence theory for purely economic losses, unless the defect causes a dangerous condition creating a risk of death or personal injury. *Id.* at 251, 634 A.2d 1330. The Court, however, went on to say that it did not need to reach the issue of risk of death or personal injury because the damages claimed were not economic losses but, rather, losses of physical property. *Id.* In other words, chickens were property and damage to them was not an "economic loss" as it had been defined in the cases. Thus, while *Whiting–Turner* was referred to in *Decoster*, it was not applied therein because of the Court's determination that property damage had occurred.

The most recent case in which *Whiting–Turner* is mentioned by the Court of Appeals is the asbestos case of *United States Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 647 A.2d 405 (1992), where the Court, citing *Decoster*, first noted:

Tort recovery for purely economic losses has ordinarily not been allowed. Instead, a purchaser suffering only economic loss because of a defective product will normally be limited to contract causes of action, including breach of implied and express warranties, and, in the case of fraud, to an action

for deceit. *Decoster v. Westinghouse, supra,* 333 Md. at 250, 634 A.2d at 1332; Prosser, *supra,* § 107, at 708.

As previously indicated, in this case the greater part of the damages against Asbestospray was for the removal of the defective fireproofing from the Walbrook Senior High School, costs normally recoverable only by a contract action. Nevertheless, in the circumstances here, we hold that the City's tort claims for compensatory damages in this asbestos action are fully cognizable.

Even where a recovery, based on a defective product, is considered to be for economic loss, a plaintiff may still recover in tort if the defect creates a substantial and unreasonable risk of death or personal injury. This legal principle was firmly established in Maryland by *Council of Co–Owners v. Whiting–Turner,* 308 Md. 18, 517 A.2d 336 (1986).... [W]e held [in *Whiting–Turner* ] that "where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition," regardless of whether the damages constitute economic loss.

Id. at 156–57, 647 A.2d at 410.

Because the negligence at issue concerned a product, the use of which involved a serious risk of physical harm, the Court held that tort remedies were available to Baltimore City.

As we read the Court of Appeals cases since *Whiting–Turner,* we do not find in any of them any expansion of the doctrine or holding of *Whiting–Turner.* We have also had occasion to consider the holding in *Whiting–Turner* (in addition to our brief mention in our *Brady, supra* ). We declined to apply its principles in *Casper v. Chas. F. Smith & Sons, Inc.,* 71 Md.App. 445, 455, 526 A.2d 87, *aff'd,* 316 Md. 573, 560 A.2d 1130 (1989), and declined to extend the "rule in *Whiting–Turner* to cases of *negligent misrepresentation* in products warranty cases" in *Boatel Industries, Inc. v. Hester,* 77 Md. App. 284, 308, 550 A.2d 389 (1988). We mentioned *Whiting–Turner,* in the context of the indemnification issues between

the *Whiting–Turner* defendants, in *Board of Trustees v. RTKL Associates, Inc.*, 80 Md.App. 45, 55–56, 559 A.2d 805 (1989), but, similarly, did not expand its concepts beyond its original holding.

The only extension of the rule of *Whiting–Turner* that we have discovered occurred in our case of *St. James Constr. Co. v. Morlock*, 89 Md.App. 217, 223, 597 A.2d 1042 (1991), where we wedded its concept with the concept discussed in *Fletcher v. Havre de Grace Fireworks Co.*, 229 Md. 196, 177 A.2d 908 (1962), which held corporate officers liable for torts of a corporation. In *St. James*, the only enlargement of *Whiting–Turner* related to the entities to which it applies, *i.e.*, under certain circumstances, allowing derivative type actions against a corporation's officer. The basic concept and limits of the *Whiting–Turner* theory remained intact.

We therefore conclude that, in Maryland, there have been no substantive expansions of the *Whiting–Turner* theory of negligence actions in building construction cases. In the case *sub judice*, appellant presents a unique concept of *Whiting–Turner* expansion. Appellant and appellee were separate subcontractors under contract with the same general contractor in construction of a relatively large project in Washington, D.C. Each of them subcontracted to perform different areas of work within the project. There was, however, no privity of contract between them. Urbans's obligation, if any, to avoid the damage Chambco alleges occurred, was, however, contractual in nature—it arose out of a contract with another party, the general contractor. If negligence, it was a negligence related to its failure properly to perform its contractual obligations with the general contractor.

While Chambco may have suffered economic loss (though even that is not clear), it suffered no damage to its property. Moreover, the alleged negligent performance of the contract[5] in no way created a risk of death or personal injury within the

---

**5.** A general rule is that one not a party to a contract cannot normally maintain an action in tort for the negligent performance of the contract. 13 Am.Jur.2d *Building and Construction Contracts* § 139 (1964).

meaning contemplated by *Whiting–Turner*. The condition to be corrected here was not a dangerous one.

We hold that this cause of action does not fit within the perimeters of *Whiting–Turner*. Neither was Chambco's property damaged. Absent privity of contract, there is no cause of action available by Chambco against Urban. Judge Cave did not err.

While our review of the *res judicata* issue strongly indicates that Judge Cave's finding in respect to this issue was also correct, we need not address appellant's questions two and three, in light of our affirmance of Judge Cave's opinion that no cause of action exists in the first instance.[6]

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

6. We have reviewed the other authorities addressed by appellant's brief. We do not find them applicable to the circumstances of this case.