689 A.2d 622

BROCK BRIDGE LIMITED PARTNERSHIP, INC., et al.

v.

DEVELOPMENT FACILITATORS, INC., et al.

No. 1768, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Feb. 26, 1997.

Melvin J. Sykes (David P. Sutton, Baltimore, Bradford I. Webb and McIntire, Johnson & Levin, Westminster, on the brief), for Appellants.

Michael P. Darrow (Hillman, Brown & Darrow, P.A., on the brief), Annapolis, for Appellees.

Argued before WENNER, DAVIS, and HOLLANDER, JJ.

DAVIS, Judge.

Brock Bridge Limited Partnership (BBLP) and Brock Bridge Builders, Inc. (BBBI) appeal from a judgment of the Circuit Court for Anne Arundel County in favor of Development Facilitators, Inc. (DFI) and Raymond Streib (Streib). Appellants had filed a four-count Amended Complaint on December 23, 1994, alleging breach of a contract to construct roadside improvements in a housing development for the agreed price, malpractice for negligently misrepresenting the costs of construction, malpractice for failure to process an application for a wetlands permit, and intentional misrepresentation.

The court dismissed the intentional misrepresentation claim at the end of the plaintiffs' case. After a ten-day trial without a jury, the court found that appellants had not carried their

burden of proof on the breach of contract claim. The court also found that the breach of a contract would not sustain an action sounding in tort, dismissing the claim for malpractice for negligently estimating the costs of construction. Appellants do not appeal the court's disposition of the wetlands claim or its dismissal of the intentional misrepresentation claim. They appeal the court's judgment regarding the breach of contract claim and the negligence claim.[1]

Appellants present the following questions for our review, renumbered and restated as follows:

I. Did the circuit court err as a matter of law when it concluded that BBLP was not indebted to BBBI for BBBI's expenditures for the project?

II. Was the circuit court clearly erroneous in its determination that it could not award damages to appellants based on anything other than pure speculation?

III. Did the circuit court err as a matter of law when it ruled that the evidence did not support a cause of action for negligent misrepresentation against Streib individually?

We answer in the affirmative to all three questions.[2] Consequently, we reverse the judgment as to the first and third issues, and vacate the judgment on the second.

## FACTS

The legal relationships of the parties to this case are interwoven with such complexity as to make a detailed explanation unhelpful. Therefore, we shall not attempt to parse out and define every bit player; however, we will provide all of the

---

1. On July 11, 1995, a consent judgment for $10,968.29 was entered against BBLP on a claim of DFI in a companion case which was consolidated with this case by the consent of the parties.

2. Appellants present an additional question: whether the court clearly erred in finding that BBLP did not spend its own money for the costs of the off-site improvements guaranteed by DFI. In light of our conclusion on the first issue, we need not address this question.

information necessary to an understanding of the issues underlying this appeal.

BBBI is a Maryland corporation whose principals are George Stone (Stone) and Weston Stone (Weston). In 1988, W.F. Utz Construction Company, Inc. (Utz) contracted to purchase real property in Anne Arundel County from Mary and Lawrence Taylor. Utz retained Streib, an engineer, to provide on-site engineering services through his company, DFI, for a contemplated development on the land, Brock Bridge Estates.[3] Streib is the president of DFI. On June 15, 1990, Utz assigned its interest in the purchase contract to BBBI, including all rights to engineering services rendered with respect to the property. The assignment was intended to cement a relationship by which Utz and Stone would participate in the development project as 50–50 partners.

On March 22, 1991, BBBI, through its principal, Stone, formed BBLP, a limited partnership with BBBI as general partner. At this point, neither Stone nor Utz had committed himself irrevocably to the development project. The latest extension of the purchase contract called for settlement by June 7, 1991. By early 1991, however, bids had been received for most of the project except for the off-site road improvements. Monetary considerations led Stone to inform Streib that the off-site road improvement costs, if too high, could cause Stone to abandon the project as economically unfeasible. Streib assured Stone that, based on an estimate performed in February by his project engineer, Matthew Morgan, the cost of the off-site improvements within the existing right-of-way of Brock Bridge Road would not be more than $1,000 per lot for sixty-seven or sixty-eight lots, which he rounded off to $70,000.

On June 5, 1991, BBBI assigned the purchase contract to BBLP. On that same day, BBLP and Stone executed a letter agreement with DFI. Stone signed individually and on behalf of BBLP, and Streib, the day after receiving the letter, signed

---

**3.** Streib was responsible for negotiating with the County the off-site road improvements and engineering services necessary to bring the subdivision development to record plat.

on behalf of DFI, in his capacity as president. The agreement read as follows:

Dear Ray:

You have advised me that the County will not sign off on the record plat for "Brock Bridge Estates" until execution and delivery of the Agreement between the Developer and the County requiring (i) design of off-site improvements (for Phases 1 and 2 as defined in the Agreement) within existing rights of way for Brock Bridge Road, for Phases 1 and 2, and (ii) construction of improvements under Phase 1 only.

On behalf of the Developer, I have advised you that we do not intend to go forward with the development of the Project without your assurance that the costs for all work required under the aforementioned Agreement (including costs of engineering, costs of construction of improvements and any and all other out-of-pocket * costs to the Developer) will not exceed $70,000 in the aggregate. You have assured me, in the exercise of your professional judgment and responsibility, that the costs required to meet the conditions of the aforesaid Agreement will not exceed $70,000. In the event costs incurred by Developer to meet the obligations to the County under the Agreement exceed $70,000 in the aggregate, you have further agreed that Development Facilitators, Inc. will be liable to Brock Bridge Limited Partnership ("BBLP") for the difference and shall reimburse, indemnify and hold BBLP harmless for any such excess.

In reliance on your representations as to costs, we are prepared to go forward by executing the Agreement on behalf of Brock Bridge Limited Partnership. Please sign below acknowledging receipt of this letter, and agreeing to undertake the liability for excess costs as provided above.

* Refer to phone conversation with Mr. Dennis Hoover, the item of out of pocket expenses means payment to third parties (i.e. right of ways) required in order that construction can occur.

At the date of this letter, no final plans or construction drawings for the off-site improvements existed. The "Agreement" referred to in the letter was the agreement between

Anne Arundel County and Utz for the development of the real estate. It defined Phase One improvements as follows:

a. Phase One consists of approximately 2,750 linear feet of road/shoulder widening, with up to 24 feet of Macadam Paving and 8 feet of 4 inches sand asphalt shoulder on both sides of Brock Bridge Road and within the existing right-of-way, and any storm drains and any other appurtenances within the existing right-of-way as shown on the plans attached hereto as Exhibit A.

In 1991, Streib held a series of conversations with County officials regarding the requirements for off-site improvements. In February 1991, as noted *supra,* Streib's project engineer, Morgan, estimated that the cost of the off-site improvements for sixty-seven or sixty-eight lots would be approximately $1,000 per lot. Streib communicated this to the County on February 27, 1991. The circuit court found that in May, 1991, the County informed Streib that the cost of improvements to Brock Bridge Road would exceed $250,000. In the letter agreement of June 5, 1991, Streib, on behalf of DFI, guaranteed Stone that it would cost $70,000 to improve Brock Bridge Road within the existing rights-of-way. In July, shortly after signing this agreement, DFI estimated that the improvements to Brock Bridge Road would cost $281,780.50.

The court found that "the estimate of $70,000.00 was for a portion of the work discussed by Anne Arundel [C]ounty in May 1991 and estimated as costing $281,780.50 in July by DFI." Shedding light on this interpretation, the court reasoned, was a letter from DFI (signed by Streib as president) to Stone and Utz dated April 5, 1991, prior to the contract, which explained:

... The end result will be the conditions as previously discussed (design the entire section of roadway, acquire the rights-of-ways from the individual property owners and only construct Phase 1 of the improvements which would parallel $70,000 plus or minus—2,200 plus or minus lineal feet providing 8 foot shoulders on both sides of the roadway). . . .

The court found that the total cost to construct Brock Bridge Road was $427,800.85, which "substantially exceeded the estimate Streib had made [to Stone]." Concluding that all parties concerned were surprised by the requirements imposed by the County (including the installation of gabion walls[4]), other expenses, and by the final costs of improving Brock Bridge Road, the court found:

> ... The costs of construction [were] clearly higher than the $70,000.00. DFI made guarantees that certain costs in accordance with the June 5, 1991 agreement would not exceed $70,000. *The Court finds that the guaranteed costs exceeded $70,000.00 ....*

(Emphasis added). Thus, the court implicitly found that DFI breached its contract with Stone and BBLP.[5]

Nevertheless, the court dismissed the contract claim because, it reasoned, BBLP failed to show specific damages. The court's decision on this point turned on two factors: the nature of the damages and the relationship between the parties to the contract. First, the court noted that several bills submitted at trial, pertaining to the Phase One improvements, referred to paving around manholes, none of which existed on Brock Bridge Road. Subcontracts were awarded without competitive bidding, and several contractors were paid to perform the same tasks. "Careless management and bookkeeping" plagued records failing to delineate whether BBBI or another construction company—Weston Builders, Inc.—was billed for work on Brock Bridge Road, or even to what portion of the road the bills pertained. Therefore, reasoned the court, even assuming that BBLP suffered damages as a result of the

---

**4.** Gabion walls are a very expensive form of retaining wall, required by the County to avoid the destruction of a bicycle path running parallel to Brock Bridge Road.

**5.** Appellees argue that the court never explicitly found that DFI breached the contract. Although the court did not say so in so many words, we see no other possible interpretation of the court's conclusion that DFI failed to deliver its end of the bargain. Appellees' argument merely splits hairs.

breach, the evidence was "insufficient for the Court to determine an amount of damages by any method other than speculation."

Second, although the court found that BBBI paid for work which "clearly benefited BBLP," the court found no evidence that BBLP was indebted to BBBI, "who was not a party to the June 5, 1991 agreement." Appellants introduced no tax returns, promissory notes, or other evidence to prove that the costs were a debt owed by BBLP. Appellants presented no evidence that BBLP reimbursed BBBI for the expenses incurred by BBBI. Therefore, the court concluded, appellants could not carry their burden that BBLP suffered damages at all as a result of the breach.

Discussing whether Streib was negligent in his estimation of the costs to complete Phase One, the court held that "no duty to guarantee future costs which may arise and which may exceed estimated costs arises as a duty of care outside a contractual agreement to guarantee such overages." The court reasoned that an incorrect estimate of future costs may prove that a mistake was made, but does not prove negligence; the proper avenue for relief was in contract, not tort.

## LEGAL ANALYSIS

### I

■ Appellants argue that the circuit court erred as a matter of law when it concluded that BBLP failed to demonstrate its indebtedness to BBBI (thus failing to carry its burden of showing damages caused by DFI's breach of the contract). Appellants' argument hinges on their interpretation of MD.CODE ANN., Corp. & Ass. (C.A.), § 9–401(2) (1975, 1993 Repl.Vol., 1996 Supp.), which reads:

The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules....

(2) The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property.

This section also applies to the general partner of a limited partnership, absent a contrary provision in the partnership agreement. *Id.* § 10–403(a). The circuit court concluded that "[t]he work which was performed clearly included work which benefited BBLP." As the work contemplated in the contract benefited the partnership, argue appellants, and as BBLP signed the contract with DFI in the first place, the contract was executed in the "ordinary and proper conduct" of the partnership's business. Because BBBI, the general partner of BBLP, paid the money due under the contract, then, under C.A. § 9–401(2), BBLP owes a debt to BBBI as a matter of law, and the circuit court erred in concluding that BBLP suffered no damages as a result of DFI's breach.

We agree. Appellees' assertions that BBBI acted as the general contractor and independent of the partnership are unconvincing. First, contrary to appellees' repeated assertions, the circuit court *never* concluded—or even remotely hinted—that there was insufficient evidence that BBBI acted as the general partner of BBLP. We are unable to fathom why appellees make this assertion—three times—in their brief. The *only* reference by the circuit court to the relationship between BBBI and BBLP was the acknowledgment that "BB[B]I is the general partner of BBLP." Though it does not clearly disprove appellees' assertion that BBBI was not *acting* as the general partner, this acknowledgment certainly does not support their position, and it certainly does not support their assertion that the circuit court came to this conclusion.

Second, neither the lack of evidence of reimbursement nor the lack of evidence of BBLP's acknowledgment of a debt owed to BBBI leads to the conclusion that BBBI could not have been acting on behalf of the partnership, as appellees assert. It is undisputed that the party to the contract was

BBLP, not BBBI. BBBI made the interest payments on the financing and covered other cost overruns.[6] The court found—and it is undisputed in this appeal—that DFI's performance under the contract benefited BBLP. Outward manifestations of indebtedness are irrelevant in this context. What matters is whether BBLP's execution of the contract was "reasonably incurred ... in the ordinary and proper conduct" of BBLP's business, and whether BBBI made the interest payments in fulfillment of BBLP's obligations under the contract. C.A. § 9–401(2).

BBLP's execution of the contract was within the conduct of its business. BBBI had assigned the Taylor contract to BBLP on June 5, 1991, so BBLP, as of that date, possessed the rights to develop the land. BBLP, as signatory under the June 5, 1991 contract with DFI, was liable for the $70,000 it would cost to construct Phase One of the off-site improvements. BBBI and Stone had formed BBLP on March 22, 1991, less than three months before the execution of the June 5 contract, and well after the machinery of the deal was set into motion; obviously, they formed BBLP for this real estate venture. It takes little intuition to conclude that the execution of the agreement with DFI on June 5, 1991, was within the proper and ordinary conduct of BBLP's business.

Similarly, BBBI paid the expenses for Phase One improvements on behalf of BBLP, rather than on its own behalf as general contractor. Appellees' argument that BBBI acted entirely on its own behalf as the general contractor, independent of its status as general partner to BBLP, ignores the fact that BBLP, not BBBI, was the party to the June 5, 1991 contract that is the subject of this litigation. This contract called for BBLP to pay no more than $70,000 for off-site improvements under Phase One of the project. BBLP paid

---

6. The testimony indicated that WSG, Inc., a corporation in which Stone was a principal, borrowed $4,050,000 from three banks to fund the project. WSG then lent the funds to BBLP, who executed a revolving credit note for the money. BBBI paid the interest on the loans.

nothing, according to the circuit court,[7] while BBBI paid the fees owed by BBLP under the contract, in addition to the cost overruns for off-site improvements. Under these circumstances, we have no difficulty in finding that, as a matter of law, BBLP was indebted to BBBI under C.A. § 9–401(2). The court erred in holding that BBBI suffered no damages from DFI's breach.

## II

 The circuit court held that, even if BBBI suffered damages from DFI's breach, any damages awarded would only be speculative, due to inaccuracies and redundancies in appellants' estimate. The court determined that

> ... evidence as to damages was not clear. Weston Builders, Inc. was involved in the residential development of Brock Bridge Estates, phases 1 and 2 of the Brock Bridge Road improvement plan, and other residential development during this time period. Several bills referenced paving around manholes, none of which exists on Brock Bridge Road. Testimony proved that subcontracts were awarded without competitive bidding and that several contractors were paid to perform the same tasks. Careless management and bookkeeping reflect records which do not clearly delineate whether BB[B]I or Weston Builders was billed for work on Brock Bridge Estates or Brock Bridge Road or on what portion of Brock Bridge Road.

Thus, the court concluded that the evidence of damages lacked sufficient clarity and certainty to justify any recovery at all.

Appellants rely on *Macke Co. v. Pizza of Gaithersburg, Inc.,* 259 Md. 479, 270 A.2d 645 (1970), for the proposition that damages need not be proven with certainty, but only estimated. *Id.* at 487–88, 270 A.2d 645. The court should not preclude all recovery, argue appellants, simply because, in some instances, the proof disclosed that amounts claimed were

---

7. In an alternative argument, appellants dispute this conclusion. Because of our analysis on the instant issue, however, we need not address this contention.

excessive or for work on a portion of the project unconnected with the guarantee. Because DFI provided an estimate to the County in connection with obtaining necessary permits and fixing the amount of its bond, appellants argue that DFI should not be allowed to challenge the reasonableness of its own construction costs.[8]

Appellees respond that many of the items contained within the estimates made by DFI reflect costs outside the scope of the June 5, 1991 agreement, and that DFI made no guarantees as to these costs. Of particular importance are the estimated costs of a very expensive gabion retaining wall ($166,875) and a split-rail fence ($9,840), that, appellees argue, were outside the "existing right-of-way" of Brock Bridge Road, a limitation to which the June 5 contract specifically refers. To impose liability for these items, and others, say appellees, would violate the intent of the agreement. In addition, appellees assert, the court correctly decided that BBLP's poor bookkeeping practices prevented an accurate apportionment of costs and payments. Thus, conclude appellees, the court properly determined that it could not award damages based on anything other than pure speculation.

With an acceptable demonstration of the amount, appellants may recover the costs they expended under the contract as compensatory damages. As Professor Corbin explained:

> Pecuniary gain is a new addition to wealth; pecuniary loss is a subtraction therefrom, examples being an expenditure of money, a destruction of goods, and a decline in price.

---

8. The court found that DFI estimated in July, 1991, that the improvements to Brock Bridge Road would total $281,780.50. Appellants argue that the court was clearly erroneous in this factual determination, indicating that exhibits and testimony established that DFI's own estimate of the amounts totalled $356,870.50. Appellants point out that the estimate of $281,780.50, relied upon by the court, was made in July, 1991. A revised cost estimate, occasioned by changes required by the County, reflected construction costs of $298,840.50. Further, on July 18, 1991, DFI estimated the costs of sediment control and drainage for Phase One at $116,395.40. Appellants concede some overlap in the two estimates, requiring a downward adjustment of $58,365.40. Accordingly, conclude appellants, the total Phase One costs, as estimated by DFI, were $356,870.50.

A breach of contract may cause loss as well as prevent gain. Recoverable damages include the amount of losses, if they satisfy the rules as to remoteness, certainty, and foreseeability.

5 CORBIN ON CONTRACTS § 1021 at 127 (1964). To recover compensatory damages, the amount must be proved with reasonable certainty and may not be based upon speculation or conjecture. *Lazorcak v. Feuerstein*, 273 Md. 69, 75, 327 A.2d 477 (1974); *Asibem Assoc., Ltd. v. Rill*, 264 Md. 272, 276, 286 A.2d 160 (1972). *See also McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 226, 37 A.2d 305 (1944). The amount, however, need not be proven to a *mathematical* certainty; the plaintiff bears the burden of adducing sufficient evidence from which the amount of damages can be determined on "some rational basis and other than by pure speculation or conjecture." *Ass'n of Maryland Pilots v. Baltimore & Ohio Railroad Co.*, 304 F.Supp. 548, 557 (D.Md.1969).

Nevertheless, we believe appellants' reliance on *Macke* to be misplaced. That case dealt with the recovery of damages for lost profits, which differ from the loss sustained in this case, because lost profits are often more difficult to ascertain than amounts expended under a contract. " '[T]he last hundred years have witnessed continual modification of the once rigid rule that anticipated profits, because inherently uncertain, were *per se* not a proper element of damages for breach of contract.' " *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 349, 138 A.2d 350 (1958) (quoting Note, *Speculative Profits as Damages for Breach of Contract*, 46 HARV. L.REV. 696 (1933)). To satisfy the "reasonable certainty" standard for lost profits when the fact of damage is proven with certainty, the amount of damages may be left to "reasonable inference." *Id.* Often, it suffices merely to produce the "best evidence" which is available to show lost profits. *Id.*

The damages claimed in the case *sub judice* were not for lost profits, but compensation for sums already expended. Corbin explained the nature of such damages:

If the defendant's breach is one that, in the usual course of things, causes a substantial pecuniary loss of such a character that its amount cannot be proved, compensatory damages are recoverable in the reasonable discretion of the jury. *If the loss is of such a kind that its amount can, in the ordinary course of things, be proved with reasonable certainty, substantial damages will be refused unless such evidence is given.*

CORBIN at 133–34 (emphasis added). This view is in accord with Maryland law. *See Lazorcak*, 273 Md. at 75, 327 A.2d 477; *Asibem Assoc., Ltd.*, 264 Md. at 276, 286 A.2d 160; *McKeever*, 183 Md. at 226, 37 A.2d 305.

The circuit court announced that any damages it awarded would be based only upon pure speculation. We are reluctant to accept this conclusion. Admittedly, errors in bookkeeping, duplicate billing, noncompetitive bidding, and other irregularities make it difficult to ascertain the precise extent of the damages caused by DFI's breach (i.e., those amounts expended by BBBI and BBLP on the guaranteed work of Phase One in excess of $70,000). Nevertheless, this difficulty should not preclude recovery by appellants completely.

Although it is not the place of an appellate court to dictate the persuasive value of evidence placed before the trial court, *see* MD.RULE 8–131(c) (1997), the estimates prepared by DFI constitute some evidence of damages sustained, and the circuit court must evaluate the credibility of this evidence on the record. Certainly, the court may weigh the fact that, however exact the estimates, they may contain some items not within the guaranteed costs as specified in the June 5, 1991 contract, and they were incurred before appellants actually paid for the work. The latter consideration may, indeed, provide strong support for the conclusion that the estimates might *not* constitute proof of "reasonable certainty." *See Lazorcak*, 273 Md. at 75, 327 A.2d 477. After all, if appellants had kept accurate account books, their actual expenditures would be easily provable. *See* 5 CORBIN ON CONTRACTS § 1020 at 125. Conclusions on these matters, however, are for the circuit court to reach.

Nevertheless, the court found that the guaranteed costs exceeded $70,000, and it should explain its basis for this conclusion. It should attempt to parse out those damages that BBLP can establish that it or BBBI suffered with reasonable certainty. *See* RESTATEMENT OF CONTRACTS 2d § 352 cmt. a ("The requirement [of reasonable certainty] does not mean, however, that the injured party is barred from recovery unless he establishes the total amount of his loss. *It merely excludes those elements of loss that cannot be proved with reasonable certainty . . . .*") (emphasis added). Further, the court found that "evidence of payments by BB[B]I was introduced." It apparently disregarded these payments because it concluded that BBLP could not claim as damages payments by BBBI. As discussed *supra,* the court erred in this conclusion. We think that BBLP and BBBI should have the opportunity to present those items of damages that they have suffered with reasonable certainty.

We remand this case to the circuit court. On remand, the court should ascertain two things: first, which of the guaranteed costs appellants can demonstrate, with *reasonable* certainty, they have incurred and second, the amount of the total damages so proven that exceed the guaranteed cost of $70,000.

## III

We turn now to appellants' final claim: that Streib owed a duty of care in tort that he breached when he negligently estimated the costs of completing Phase One of the project.[9] The circuit court implied that it was deciding the

---

9. In their Amended Complaint, appellants claimed that both Streib and DFI were liable for negligent misrepresentation. On appeal, however, appellants abandon the claim that DFI was liable. As discussed *infra,* we conclude that appellants have stated a cause of action for negligent misrepresentation against Streib, by reason of DFI's potential commission of negligent misrepresentation and Streib's relationship with DFI. Because appellants abandoned the claim against DFI, on remand they may only pursue a claim against Streib individually. *See* MD RULE 8–504(a)(5) (1997); *Jacober v. High Hill Realty, Inc.,* 22 Md.App. 115, 125, 321 A.2d 838, *cert. denied,* 272 Md. 743 (1974) (an argument not presented in a brief will not be considered on appeal).

negligent misrepresentation claim on the merits. It did not do this. Rather, in holding that the dispute was to be governed solely by contract law, not tort law, the court essentially decided that appellants had failed to present evidence that established a cause of action for negligent misrepresentation. As the trier of fact, the court was not compelled to make any evidentiary inferences in favor of BBLP. *See* MD.RULE 8–131(c) (1997). Nevertheless, the court did not rule against appellants on any evidentiary issues. Rather, the court concluded that no duty to guarantee future costs which may arise, and which exceed estimated costs, arises as a duty of care outside a contractual agreement to guarantee such overages. This conclusion was legal, not factual, in nature. To prevail on appeal, then, appellants must demonstrate that the evidence received supported a cause of action for negligent misrepresentation as a matter of law.

The Court of Appeals, in *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982), clarified the elements of the tort of negligent misrepresentation. To prevail, a plaintiff must prove, by a preponderance of the evidence, the following:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Id.* at 337, 439 A.2d 534. The element at issue in this case is: whether Streib owed a duty of care to BBLP and Stone while estimating the costs of the Phase One off-site improvements.

"The nature and extent of a tort duty . . . depends in part on the status of the party upon whom it is sought to be imposed, and upon his relationship to the party claiming the

benefit of it." *Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.*, 308 Md. 18, 36, 517 A.2d 336 (1986). In *Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986), the Court of Appeals discussed the nature of tort liability for acts causing economic, rather than physical, harm. The Court said that, when the failure to exercise due care creates only the risk of economic harm, a plaintiff must demonstrate an "intimate nexus" between the parties. This requirement is satisfied by contractual privity or its equivalent. *Id.* at 534–35, 515 A.2d 756. Another factor relevant to the existence of a tort duty is the nature of the business of the party upon whom the burden may be imposed. *Id.* at 541, 515 A.2d 756. "The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants." *Id.* We see no reason why this duty of care should not extend to engineers, especially as "in those occupations requiring particular skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill." *See id.*[10]

The circuit court concluded that no duty in tort existed separate from the contract duty owed by appellees. Although it acknowledged the holding of *Jacques*, 307 Md. at 541, 515 A.2d 756—that a tort duty of care arises from contractual dealings with professionals—the court distinguished the nature of the duty in that case, saying:

> ... in the case at bar, the duty arises not from the general duty of care owed by a professional engineer but rather

---

**10.** The existence of a tort duty for purely economic damages does not extend to products liability cases. Economic damages are generally not recoverable under a negligence theory in these cases. *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 251, 634 A.2d 1330 (1994); *United States Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 156, 647 A.2d 405 (1994). The exception to this rule is when the defect causes a dangerous condition creating a *risk* of death or personal injury, even though the resulting injury is only economic. *Whiting–Turner*, 308 Md. at 33–35, 517 A.2d 336. As the case *sub judice* is not a product liability case, *Whiting–Turner* and its progeny are inapposite.

from a contractual agreement. No duty to guarantee future costs which may arise and which exceed estimated costs arises as a duty of care outside a contractual agreement to guarantee such overages. An incorrect estimate of future costs may prove a mistake was made, but does not prove negligence.

We disagree. Our opinion in *Ward Development Corp., Inc. v. Ingrao,* 63 Md.App. 645, 493 A.2d 421 (1985), is dispositive of this issue. There, homeowners sued a licensed real estate agent for fraudulent and negligent misrepresentation when, in a contract, the agent incorrectly estimated a charge to the homeowners for sewer and water connection. *Id.* at 656, 493 A.2d 421. Holding that the plaintiff had stated a cause of action for negligent misrepresentation, we said:

> We recognize the difference between a promise of future events and an estimate by one knowledgeable in a particular field. *In the latter situation, redress may be had for representations as to future facts and not merely as to past or existing facts.* (Citation omitted).... *In the instant case, the homeowners relied on Ward and its agents as knowledgeable in the field of real estate. Ward, as the developer of the subdivision, and Behrens, as the real estate selling agent, held themselves out as knowledgeable in matters such as the charge for a sewer and water connection. The homeowners were entitled to rely on that estimate to a reasonable extent.* But the charge stated in the contract was so far removed from the actual charge it cannot properly be termed a reasonable estimate and can only be explained as a misrepresentation. Therefore, we hold that the estimate of the sewer and water connection charge was actionable under a theory of negligent misrepresentation.

*Id.* (emphasis added).

The situation in the case *sub judice* is directly analogous. Rather than a promise of future events, DFI's cost estimate for constructing the Phase One off-site improvements was an "estimate by one knowledgeable in a particular field" relevant

to the accuracy of the estimates—engineering. Appellants were entitled to rely on this estimate to a reasonable extent and to recover for damages incurred because of this reliance, even though the representation (assuming it was negligently made) encompassed future events. *See id.* As in *Ward Development Corp.*, appellants relied on DFI's and Streib's engineering expertise. Streib estimated the costs as an engineer. That the cost estimation was within DFI's and Streib's engineering competence is beyond dispute; as appellees themselves argue, Streib was qualified as an expert in civil engineering at trial and testified that, *based upon his experience* as an engineer, the costs associated with the construction were unreasonable. Moreover, in July 1991, after signing the contract with BBLP, Streib made several estimates over his professional seal as an engineer, and in that capacity. Finally, MD.CODE ANN., Bus.Occ. & Prof. (B.O.P.) § 14–101(f)(2) (1989, 1995 Repl.Vol.), specifies that in regard to a project, the phrase "practice engineering" includes consultation, design, evaluation, investigation, and planning. Estimating the costs of construction is integral to all of these activities.[11]

Thus, if appellants had argued their claim against DFI instead of against Streib, we would conclude that a cause of action lies against DFI for the representations it made in the June 5, 1991 contract. Present in this case are the twin elements, outlined in *Jacques*, of contractual privity and a professional relationship. *Jacques*, 307 Md. at 535, 541, 515 A.2d 756.

█ Nevertheless, because appellants only argue that Streib, not DFI, was negligent, we must examine whether the record demonstrates that appellants may pursue a negligence claim against Streib. Streib did not sign the contract in his own capacity, but as president of DFI—thus, the parties to

---

11. Section 14–101(f)(3) also lists exclusions from the phrase "practice engineering." None of the exclusions encompasses cost estimation of the stages of a project, with the possible exception of (v), "appraising real property." This exception is irrelevant here, as the estimates at issue did not concern the price of land.

the contract were DFI and BBLP, and BBLP had no relationship with Streib sufficient to sustain the negligence claim. Furthermore, appellees continue, Streib never dealt with BBLP at all until the day he signed for DFI as president. Therefore, say appellees, there is no contractual privity or special relationship that would impose a duty of due care on Streib when making representations in the scope of his performance.

Adherence to corporate form is usually appropriate while analyzing the terms of a contract. If the president of a company signs a contract as the president, intending to bind only the company, then the foundation of contract law—to divine the intent of the parties to the contract—dictates that only the company be bound. *Hall v. Barlow,* 260 Md. 327, 346, 272 A.2d 386 (1971). In such a case, the parties did not bargain for the individual to be bound.

Streib's potential liability, however, is founded in tort rather than contract. It is well settled that an agent may be liable for his own acts of negligence performed within the scope of employment by his principal. *See, e.g., E. G. Rock, Inc. v. Danly,* 98 Md.App. 411, 430, 633 A.2d 485 (1993). Nevertheless, the Court of Appeals in *Jacques* noted that an inverse correlation exists between the nature of the risk involved on the one hand, and the relationship of the parties on the other. *Id.* at 537, 515 A.2d 756. The Court said that "if the risk created by negligent conduct is not greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent." *Id.* The Court of Appeals thus made contractual privity, *or its equivalent,* a necessary *element* of the duty of care required by *Martens,* 292 Md. at 337, 439 A.2d 534.

The Court of Appeals addressed the issue of whether corporate officers are liable for the torts of the corporation in *Tedrow v. Deskin,* 265 Md. 546, 290 A.2d 799 (1972). In that case, the appellant had purchased an automobile from Tom and Martin Ford, Inc. The appellant alleged that the odometer had been rolled back when he bought the car, and named

the corporation and several officers and stockholders as defendants in a lawsuit for tortious fraud. *Id.* at 547–48, 290 A.2d 799. The appellant alleged no physical injury, claiming only that he had "expended large sums of money for repairs," *id.* at 551, 290 A.2d 799, an injury later characterized by the Court of Appeals as purely economic. *See Decoster,* 333 Md. at 250, 634 A.2d 1330 (economic losses include the cost to repair or replace the product).

The individual appellees (officers of the corporation) argued that the circuit court's dismissal was proper because the contract of sale was between the appellant and the corporation, not between the appellant and the individual appellees. *Tedrow,* 265 Md. at 548, 290 A.2d 799. Thus, the individual appellees could not be held responsible for the acts of the corporation. *Id.* at 550, 290 A.2d 799. The Court of Appeals sided with the appellant, however, and remanded to the circuit court for a new trial:

> The general rule is that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body. . . . [T]o make an officer of a corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act.

*Id.* at 550–51, 290 A.2d 799 (citations omitted). The Court remanded for a new trial. *Id.* at 552, 290 A.2d 799.

Whether corporate officers could be held liable for the torts of the corporation was again addressed in *St. James Constr. Co. v. Morlock,* 89 Md.App. 217, 597 A.2d 1042 (1991). In that case, we extended the holding of *Whiting–Turner,* 308 Md. at 22, 517 A.2d 336 (abrogating the privity requirement in product liability cases when the tortious act creates a risk of personal injury) to incorporate the rule of *Tedrow;* thus, corporate officers are liable for those torts of the corporation carrying a risk of personal injury, if they personally commit,

inspire, or participate in them. *Morlock,* 89 Md.App. at 223, 597 A.2d 1042. *See Chambco v. Urban Masonry,* 101 Md.App. 664, 672–81, 647 A.2d 1284 (1994), *vacated on other grounds,* 338 Md. 417, 659 A.2d 297 (1995), for a history of the development of the *Whiting–Turner* doctrine.

We conclude that the holding of *Tedrow* applies in cases in which the tort committed by the corporation carries a risk only of economic loss, as well as in those cases in which the risk is of personal injury. Although in *Morlock* we cited the abrogation of the privity requirement in product liability cases involving personal injury as a partial justification for this extension, *Morlock,* 89 Md.App. at 223–24, 597 A.2d 1042, we did not rely exclusively on this rationale. Moreover, *Tedrow* involved solely economic injury, not a risk of personal injury.[12] The abrogation of the privity requirement relates more closely to the types of acts actionable rather than to the entities to which liability will attach, a distinction we drew in *Chambco,* 101 Md.App. at 680, 647 A.2d 1284 ("[i]n *St. James,* the only enlargement of *Whiting–Turner* related to the entities to which it applies. . . . The basic concept and limits of the *Whiting–Turner* theory remain intact."). We view this approach as consistent with the Court of Appeals's language in *Jacques,* 307 Md. at 535, 515 A.2d 756, requiring the existence of contractual privity *or its equivalent.* If the conditions of *Tedrow* are fulfilled, the relationship between a corporate officer and a plaintiff harmed by the corporation's negligence is the "equivalent" of contractual privity.

Under these particular facts we hold that the conditions of *Tedrow* are indeed fulfilled, and the evidence supports this cause of action. Streib is the president of DFI, and personally handled most of the details surrounding the planning and

---

**12.** With the pronouncement by the Court of Appeals that tort liability will not lie in product liability cases involving a risk of purely economic damages, *see e.g., Decoster,* 333 Md. at 250, 634 A.2d 1330, the aspect of *Tedrow* upholding a duty of care on the part of the corporation is probably invalid. In our opinion, however, this does not affect the concept relevant here—that under certain circumstances, "derivative type actions" may be allowed against a corporation's officer. *Chambco,* 101 Md.App. at 680, 647 A.2d 1284.

construction of the Phase One off-site improvements. He was the project engineer since 1988, as evidenced by a letter from Streib to Utz on November 14 of that year. As appellees established during their cross-examination of Stone, Streib held a conversation with Stone before signing the contract, and in that conversation he estimated the costs as DFI subsequently guaranteed in the contract of June 5, 1991. In April 1991, DFI, through Streib, wrote Stone and Utz, referring to "the conditions as previously discussed" (including the cost estimate of $70,000). Letters from DFI (through Streib) to Stone dated September 18, 1990 and December 31, 1990 (both before the contract date), although they do not mention the costs of Phase One improvements, demonstrate that Streib was integrally involved with Phase One and communicated with Stone before signing the June 5, 1991 contract.

Far from being merely an instrument through which DFI entered into contracts, Streib exercised his own professional judgment and skill in making the cost estimates for Phase One of the off-site improvements. Ultimately, Streib personally made the estimates on DFI's behalf in the contract of June 5, 1991. In short, Streib personally committed the acts that appellants allege were negligent. If the court determines that the corporation (with whom appellants have contractual privity) was negligent in its representations to appellees, then Streib will be liable for that negligence. *Morlock*, 89 Md.App. at 223, 597 A.2d 1042.

Our conclusion is strongly reinforced by B.O.P. § 14-401(c)(2). That section reads:

(c) *Liability not affected.*—

(2) An individual who practices engineering through a corporation, limited liability company, or partnership is not, by reasons of the individual's employment or other relationship with the corporation, limited liability company, or partnership, relieved of any individual responsibility that the individual may have regarding that practice.

*Id.*

To deny relief to BBLP for lack of contractual privity would shield Streib from the consequences of his negligence (assum-

ing it is proven) in a way that B.O.P. § 14–401(c)(2) prohibits. Essentially, Streib provided personal engineering services to BBLP through the corporate entity DFI, of which he is the president. BBLP relied upon verbal guarantees made by Streib to Stone, guarantees to which Stone refers in the June 5 contract. Although DFI made the contractual guarantee, the guarantee arose out of engineering services (i.e., estimates, plans, and negotiations) provided by Streib in his capacity as an engineer licensed, *inter alia,* in the State of Maryland. To deny a cause of action against Streib would vitiate the very words of the statute, and would run squarely against the legislative policy to "safeguard life, health, and property and to promote the public welfare by regulating persons who practice engineering in the State." B.O.P. § 14–102. Denying a cause of action would also open the door for engineers to escape the consequences of tortious negligence by acting always through the corporate form. Section 14–401(c)(2) *expressly* prohibits this result. This section, in and of itself, grants appellants a cause of action against Streib. We remand to the circuit court for an evaluation of the merits of this claim.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED IN PART AND VACATED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**